IN THE CHANCERY COURT FOR JEFFERSON COUNTY
AT DANDRIDGE, TENNESSEE

THE DOUGLAS LAKE RESORT                )
OWNER'S ASSOCIATION, INC.,             )
                                       )
          Plaintiff,                   )
                                       )
v.                                     )        NO. 12-CV-117
                                       )
DESTINY OF TENNESSEE, LLC f/k/a        )
DESTINY, INC., LAKE CASA LIMITED       )
PARTNERSHIP, ABBACUS HOLDINGS,         )
LTD. [sic] et al.                      )
                                       )          C_____ ____ COURT
          Defendants,                  )
                                       )         AUG 25 2016
DESTINY OF TENNESSEE, LLC f/k/a        )         HOUR 2:50 P___M
DESTINY, INC., LAKE CASA LIMITED       )         _____
PARTNERSHIP,                           )         CLERK & MASTER
                                       )         JEFFERSON COUNTY, TN
          Cross-Defendants,            )
                                       )
ALLEN L. HOOD                          )
1529 Tan Bark Way                      )
Sevierville, Tennessee  37876          )
                                       )
          Third Party Defendants.      )


TRANSCRIPT OF PROCEEDINGS

August 16, 2016

This is a true and perfect copy of the original
filed in this office.
This  15th  day of OCTOBER 20 19 .
Nancy C. Humbard  C&M

THOMPSON & CHILDRESS COURT REPORTERS
POST OFFICE BOX 411
ALCOA, TN 37701

(865) 281-8220

2

APPEARANCES:


       MR. DOUG E. TAYLOR
       Attorney for Abbacus
       Holdings, Ltd. [sic] et al.


       MR. ALLEN HOOD
       Pro Se

3

# I N D E X

PAGE

WITNESS

JAMES H. RIPLEY

        Direct Examination by Mr. Taylor      8
        Cross-Examination by Mr. Hood        28

ARTHUR ROONEY

        Direct Examination by Mr. Taylor    34
        Cross-Examination by Mr. Hood       61
        Redirect Examination by Mr. Taylor  79
        Recross-Examination by Mr. Hood    81
        Redirect Examination by Mr. Taylor  83

ALLEN HOOD

        Direct Examination by Mr. Taylor    88
        Testimony from Mr. Hood        107
        Cross-Examination by Mr. Taylor    108

# E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Letter to Allen Hood from Ross Gray with Attachments | 11 |
| 2 | Interim Accounting Summary Dated June 22, 2016 | 19 |
| 3 | Statement from State of Tennessee For State Tax Lien | 23 |
| 4 | Letter to Allen Hood from Ross Gray Dated March 4, 2015 | 31 |
| A | Smoky Mountain Lake House 1015 Willard Way (Collective) | 37 |
| B | Summary of Claim Relating to 1015 Willard Way | 52 |

4

I N D E X (Continued)

E X H I B I T S (Continued)

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| C | General Warrant Deed | 55 |
| D | Deal Sheets (Collective) | 57 |
| E | List of Buyers, Order of Construction, Lot Number, Cabin Type, Mortgage or Cash, Construction, Status, Purchase Price, Sales Commission, and Furniture (Collective) | 57 |
| F | MLS List for the Lake House on Stetson Lane or Willard Way | 60 |
| G | MLS Listings | 74 |
| 5 | Contract | 64 |
| 6 | Summit View Spreadsheet | 69 |
| 7 | Notebook with Mr. Hood's Paperwork | 75 |
| 8 | Deposition of Arthur Rooney Dated 6/19/14 | 79 |
| 9 | Florida License of David Rooney | 87 |
| 10 | Certificate of Limited Partnership for Lake Casa | 89 |
| 11 | Insurance | 93 |
| 12 | Insurance | 94 |

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 5 of 131

5

1          This case came on to be heard on the 16th

2     day of August, 2016, in the Chancery Court for

3     Sevier County, Sevierville, Tennessee, before the

4     Honorable John Fowler, presiding.

5          The Court having been duly opened, the

6     following proceedings were had, to wit:

7   (The prospective witnesses were sworn.)

8          THE COURT:  First off, do you want to make a

9     motion for continuance that I'm going to overrule?

10         MR. HOOD:  Okay.  Is that what I do?

11         THE COURT:  So you're making this motion for

12    a continuance.

13         MR. HOOD:  Making a motion for a continuance

14    based on lack of counsel.

15         THE COURT:  Okay.  And you're Allen Hood --

16         MR. HOOD:  Yes, sir.

17         THE COURT:  -- that's some kind of officer

18    with Destiny?

19         MR. HOOD:  I'm sorry?

20         THE COURT:  What's your position with

21    Destiny?

22         MR. HOOD:  Owner.

23         THE COURT:  Okay.  Overruled.  Call your

24    first witness.

25         MR. TAYLOR:  Are you going to swear him?

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 6 of 131

6

1          THE COURT:  Are you going to testify.

2          MR. HOOD:  Do I have to?

3          MR. TAYLOR:  I may call him.

4          MR. HOOD:  Okay.

5          THE COURT:  Okay.

6          MR. HOOD:  I'm not sure how this works, so

7     please just tell me what I need to do.

8          THE COURT:  Well, first off, you want to

9     raise your right hand and say I swear to tell the

10    whole truth and nothing but the truth.

11         MR. HOOD:  I swear to tell the whole truth.

12         THE COURT:  You don't have to repeat it.

13    Just --

14         MR. HOOD:  Oh, okay

15         THE COURT:  That's okay.  Thanks.  All

16    right.  So what's going to happen is, he's going to

17    start to put on proof that you have a right to

18    cross-examine on.  Okay?  His first witness is going

19    to be James Ripley, who's an attorney here in

20    Sevierville, who's the receiver.  You understand

21    what position he holds?

22         MR. HOOD:  No.

23         THE COURT:  He's appointed by the Court to

24    take control of this house --

25         MR. HOOD:  Okay.

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 7 of 131

7

1          THE COURT:  -- this multistory house on the

2     lake.

3          MR. HOOD:  Can I say something?

4          THE COURT:  Sure.

5          MR. HOOD:  You guys can have it.

6          MR. TAYLOR:  What?

7          MR. HOOD:  The house.  It's not worth it to

8     me.  It's just money.  You know you didn't earn it,

9     but it's okay.  I'll sign --

10          MR. TAYLOR:  Can we adjourn and --

11          MR. HOOD:  -- I'll sign --

12          MR. TAYLOR:  -- for a few minutes and talk

13     about this.

14          THE COURT:  All right.  Ten minute recess.

15     If he's going to give up the house, it may eliminate

16     something.

17 (A break was taken.)

18          MR. TAYLOR:  Your Honor, we're ready to

19     proceed.

20          THE COURT:  All right.  Okay.  So your

21     motion for a continuance is overruled.  All right.

22     Call your first witness, which is --

23          MR. TAYLOR:  My motion in limine, did you

24     rule on that?

25          THE COURT:  I probably won't grant it.  I'll

8

1        just overrule it for the time being.

2                MR. TAYLOR:  All right.  I'm going to call

3        the receiver, James Ripley.

4                THE COURT:  Okay.

5                        JAMES RIPLEY,

6        the first witness called on behalf of Abbacas,

7        having been first duly sworn, was examined and

8        testified as follows:

9                        DIRECT EXAMINATION

10   BY MR. TAYLOR:

11        Q      Mr. Ripley, will you state your name for the

12   Court, please?

13        A      James H. Ripley.

14        Q      And what do you do, Mr. Ripley?

15        A      I practice law here in Sevierville,

16   Tennessee.

17        Q      How long have you done that?

18        A      Oh, since 1983.

19        Q      A long time?

20        A      A long time.

21        Q      About the same as I've been married.  Tell

22   me what your association with this case is.

23        A      Back in July of 2014, I was appointed as

24   receiver over this property by, I think -- I believe it was

25   a special judge at that point, and I've been the receiver

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 9 of 131

9

1   ever since.

2          Q        And what were your duties by order of the

3   Court?

4          A        Well, I was to take control of this property

5   and to account for any income and so forth that was coming

6   in, keep it up, generally act as the operator of the

7   property.

8          Q        And this is a property that's commonly

9   referred to as the lake house; is that correct?

10         A        Yes, sir.

11         Q        Okay.  So you said operate the property of

12  the lake house.  Had the lake house been operated as a

13  business?

14         A        Well, my understanding when I was appointed

15  was that it was being operated as a business, and I know

16  for a fact that at least for some period of time, it was

17  rented.  It was my understanding that Mr. Hood had

18  possession of the property, certainly at least when I took

19  over in 2014, and I believe everyone involved, except

20  perhaps Mr. Hood, was of the impression that this property

21  was going to be utilized to generate income which would be

22  then shared in whatever percentage these partners had

23  determined that they would share it.

24         Q        Did you ever get any information or data

25  regarding the operation prior to your taking over?

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master - Page 10 of 131

10

1      A       Very, very little.  I immediately contacted

2  both counsel for the parties.  Mr. Gray was Mr. Hood's -- I

3  say Mr. Hood.  I believe it's Destiny of Tennessee, but

4  Mr. Gray was the counsel for that entity.  And he provided

5  me with this set of documents which contained some

6  information but was not very complete.  If you'd like to

7  see this, and I'm sorry.  I only have one copy with me

8  today.

9      Q       Let me just show Mr. Rooney for a second.

10     A       Uh-huh.

11             MR. TAYLOR:  Your Honor, could I go and

12         shoot a couple copies of this?

13             THE COURT:  Yeah.  Fine.

14  (Mr. Taylor went to make copies.)

15  BY MR. TAYLOR:

16     Q       There you go.

17     A       So I was appointed in July of 2014, and I

18  continuously attempted to contact Mr. Gray.  Mr. Taylor was

19  very helpful and cooperative and so forth.  Mr. Gray whose

20  client was in possession, for whatever reason, was not

21  particularly responsive to my requests for information.

22         And the information that I've just handed counsel --

23  I don't know if it's been made an exhibit or not, but I

24  obtained it only after coming to the Chancellor and getting

25  an order requiring cooperation, because I couldn't seem to

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 11 of 131

11

1    get Mr. Gray to -- not Mr. Gray, but I suppose his client

2    to provide information that I needed.  And so in March of

3    2015, I believe it was March the 3rd of 2015, the

4    Chancellor entered an order requiring cooperation.  And in

5    the packet that I have produced and counsel just made a

6    copy of, the Court can see that there are some tax

7    documents.  I direct your attention to page 13 and 15, Your

8    Honor.  I don't know if you -- did you give the Court one

9    of these?

10        Q       I did not.

11        A       Well, he can look on mine.

12                MR. TAYLOR:  Can we just go ahead and make

13        that the first exhibit to his testimony?

14                THE COURT:  That's fine.

15   (Exhibit No. 1 was filed.)

16                THE WITNESS:  Your Honor, I'll go ahead and

17        pass that to you.  If you can look at page 13 with

18        me.

19                THE COURT:  All right.  Thank you.

20   BY MR. TAYLOR:

21        A       It's hard to see the numbering on the pages,

22   but this would be sort of toward the back of the document,

23   I believe.  What we're looking at specifically would be the

24   2012 Schedule E Worksheets.  I don't know if you're there.

25                THE COURT:  Page 13?

12

1          THE WITNESS:  On mine, it's marked at the

2    very top.  It's a fax number 13 of -- or 12 of 15 is

3    what I would direct your attention to.

4          THE COURT:  12.  This document has 13 --

5    page 13 on the right-hand side.  Is that the same

6    page?

7          THE WITNESS:  I believe so, Your Honor.

8          THE COURT:  13 out of 15?

9    BY MR. TAYLOR:

10         A      And then that's the 2012 Schedule E, and if

11   you look at the second page of that schedule, you'll see

12   that the rental income that this property produced,

13   according to this schedule provided by Mr. Hood for the

14   year 2012, was eighty-three thousand two hundred and

15   seventy-six dollars.

16         THE WITNESS:  Do you see that, Your Honor?

17         THE COURT:  Yes.

18   BY MR. TAYLOR:

19         A      Okay.  And so it's apparent to me, and I

20   think quite reasonable to assume that this property can

21   produce, you know, that kind of money on a regular basis.

22   Well, what happened was, shortly after I got this

23   documentation, I was contacted by someone -- it could have

24   been Mr. Gray; I suspect it was -- to say that he had

25   learned that his client was living in the subject house,

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 13 of 131

13

1  which was contrary to everything that we had understood was

2  going on.  Because I had been provided this information

3  that had indicated that it had been rented in the past, but

4  now I was being told that Mr. Hood was actually living in

5  the property.

6        And obviously, that was not -- well, to my

7  knowledge, it wasn't producing any income for the

8  partnership at that time.  So I felt that it would be

9  necessary for the receivership to regain possession of the

10  property.  So I hired counsel at that point, which was in

11  the summer of 2015, last summer.

12        The reason obviously for hiring counsel was, I

13  didn't want to be both a witness and attorney in -- I hired

14  attorney Greg Logue with the firm of Woolf McClane, and in

15  July of 2015, we sought possession by writ of an action for

16  unlawful detainer.  And that matter was heard, and an order

17  of possession entered.

18        To my knowledge, Mr. Hood voluntarily vacated

19  following the -- that proceeding, and I took possession,

20  physical possession of the premises in September of 2015.

21  Specifically on September the 10th of 2015, I met a

22  locksmith at the property, changed the locks, and took

23  physical possession.  At that point, Mr. Hood had moved

24  out.

25        Q        Mr. Ripley, when you began to serve as

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 14 of 131

14

1    receiver, who was the fee simple owner of the property?

2        A        You know, I don't remember the entity

3    names.  I know that -- I know that subsequent to me getting

4    involved, the Court ordered Mr. Hood to execute a deed or

5    some document to convey an interest to your clients.  But I

6    don't remember, off the top of my head, who those entities

7    were.  There was Destiny, Lake Casa Limited Partnership,

8    and apparently, from what I understood -- and I didn't

9    verify this -- there had been some transfer to an entity

10   that then had to reconvey to create a half inch interest --

11   legal half interest in your clients.

12       Q        Did you deal with the insurance on the

13   house?

14       A        I did.  There was insurance in place, but

15   the address for this property had changed.  This was a

16   subdivision that was developed by Mr. Stetson and was one

17   of the subdivisions that was very, for lack of a better

18   word, troubled.  The surveys were inaccurate or defective.

19   They showed, in many cases, lot lines with houses sitting

20   right on the lot line.

21       The bank stepped in -- I think it was First American

22   stepped in and spent a whole lot of money to straighten out

23   the subdivision, to get it resurveyed, to straighten out

24   the infrastructure.  And so this property had -- when I

25   first got involved, had an address on Stetson Lane, and so

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 15 of 131

15

1    when I went to try to determine what the insurance

2    situation was, it was very confusing because it showed that

3    Mr. Hood had insured a property on Stetson Lane but this

4    address, the current address, when I got involved, was

5    Willard Way.  So it took a while to determine what the

6    situation was, but we secured insurance and have kept it

7    insured ever since.

8         Q       Did you secure insurance for both fee simple

9    owners, both one-half fee simple owners?

10        A       Yes.

11        Q       Would that be for Abbacas?

12        A       I'm sorry?

13        Q       Would that be for Abbacas on --

14        A       Yes, Abbacas Holding Limited, I believe, on

15   the one end and, I guess, Destiny on the other.  I'd have

16   to look at my -- I'd have to look at my insurance

17   certificate, which may take me a little while to find.  But

18   anyway, we did -- he had it insured -- Mr. Hood had it

19   insured, but there wasn't -- it was insured just in the

20   name, as I understand, of his entity, and so we insured it

21   in the name of both.

22        Q       Okay.  Did you inspect the property?

23        A       I did.  And that was -- that would have been

24   in September of 2015.  I went to the property.  It was in

25   relatively good condition.  I couldn't see where there had

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 16 of 131

16

1    been any kind of malicious damage to it, but it was in need

2    of certain things and still is.

3        The heat and air conditioning systems have got to be

4    replaced.  There was a pretty distinct musty odor in the

5    lower level that concerned us that there might be water

6    leaks.  I had a plumber come out there.  There were some

7    plumbing fixtures that needed to be worked on, toilets that

8    were running constantly and that kind of thing.  And the

9    home has a, what I would consider, to be a very elaborate

10   water system, water treatment system, and I didn't know

11   anything about that or how to operate, but we got the

12   plumber out there.

13        And when you get to my accounting, one of the

14   expenditures you're going to see is where I hired the

15   plumber to fix those things and get it squared away.  I got

16   an electrician out there.  There had been a double range in

17   the kitchen, one of these double oven kind of deals.

18   Apparently, for whatever reason, it had been removed from

19   the kitchen.  I found it downstairs in the basement --

20   actually, outside on the patio on the ground floor.  And it

21   had been replaced with a range that had one oven, and that

22   appliance was very out of character with what is a very

23   upscale property.  It was very out of -- out of character

24   and just didn't appear appropriate for that kitchen the way

25   that kitchen was otherwise set up.

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 17 of 131

17

1        Q        Were there any other maintenance issues that

2    you've identified with the house?

3        A        Well, there's -- yes.  There is a serious

4    concern, and one -- my goal was to see what I could do to

5    get this property up as a rental property and get it

6    producing income.  But it's situated such that the house is

7    very close to the water and when the water's up in the

8    summer, it's very close to the water.  And there is in the

9    yard -- the yard goes out just a short distance and then

10   drops off to the -- to the water.  And I became very

11   concerned that there was no fence or other protection along

12   the waterfront there, and there was really no good way to

13   get down to the waterfront without sort of trying to scale

14   this loose shell bank.

15        And I was consulting with a lady, whose name escapes

16   me, who's in the rental -- resort rental business, and I

17   can't remember her name off the top of my head.  But

18   anyway, and that was one of her concerns was that, you

19   know, if you're going to have families out here, what's

20   going to make this a valuable rental property or an

21   attractive rental property is the ability to access Douglas

22   Lake.  It's right on the water.  People are going to want

23   to have boats.  They're going to want to use this point

24   that the house is situated on.  And without having some

25   sort of a landing and steps way down to a dock and that

18

1    kind of thing, it -- it just -- it would be dangerous, and

2    it would not be something that could be readily rented or

3    should be rented without that being fixed.

4          Q      You say you have in your --

5          MR. HOOD:  Can I object?  Is that allowed?

6          THE COURT:  Well, you're going to have a

7    right to testify on your own behalf as long as you

8    want to, plus you can ask questions of him.  But you

9    can't stop in the middle while --

10         MR. HOOD:  Okay.

11         THE COURT:  You'll have a right to ask

12    questions.  Just remember what you want to ask him.

13         MR. HOOD:  Okay.

14         THE COURT:  Go ahead.

15  BY MR. TAYLOR:

16         Q      Okay.  You have basically an accounting that

17  goes to the maintenance issues?

18         A      I do.

19         Q      Maybe that's a good time for you to go

20  through that.

21         A      Okay.  Does Mr. Hood have a copy of it?

22         MR. HOOD:  No, sir.

23         Q      Do I?

24         A      Yeah.  I handed you one this morning.

25  There's a copy for you and one for him.  And if you still

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 19 of 131

19

1   have that one that I gave you, then you might give that to

2   the Court, Doug.

3            MR. TAYLOR:  May I approach, Your Honor?

4            THE COURT:  Sure.

5            MR. TAYLOR:  There you go.

6            THE COURT:  Is this the second exhibit.

7            MR. TAYLOR:  That's going to be the second

8       exhibit to his testimony.

9   (Exhibit No. 2 was filed.)

10  BY MR. TAYLOR:

11       A       All right.  First, let me say that it became

12  immediately necessary for me to obtain some working funds

13  to keep this place up and to pay bills like the locksmith

14  and the heat and air people and so forth and so on.  So my

15  attorney sought an order for a special assessment and that

16  was ordered.

17       The special assessment was to be in the amount of

18  ten thousand dollars for each side.  That assessment order

19  went down either in late September of 2015 or early

20  October of 2015.  The Rooneys obeyed the Court order and

21  deposited ten thousand dollars with me.  Mr. Hood did not.

22       The fact that he did not tied my hands in many ways

23  because I couldn't -- I didn't have the funds to make the

24  major repairs that were needed.  The Rooneys, I should

25  say -- and this is reflected in this accounting as well, if

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 20 of 131

20

1   you have it in front of you, Your Honor.  I don't know if

2   the court reporter handed it back to you.

3            THE COURT:  Yeah, I got the accounting.

4   BY MR. TAYLOR:

5        A       Yeah.  Okay.  The Rooneys had also

6   deposited, at my request, a thousand dollars because I was

7   paying out of my law firm's -- paying out of my pocket, in

8   effect, for things, and the Rooneys deposited a thousand

9   dollars initially, and then they made the deposit of ten

10  thousand dollars for a total of eleven thousand dollars.

11           Then -- well, I can go through this, but you can

12  see, as I mentioned earlier, the first entry under

13  expenditures is September 10, 2015.  That's when I first

14  obtained possession, and that charge was for the

15  locksmith.  I had to change the power over into my name,

16  the electric power, and so I got the Sevier County Electric

17  System on an expedited basis to do that, and they got us

18  electric.

19           You'll see some travel expenses where I've gone back

20  and forth from my office.  I had an electrician, Bucy

21  Electric come out there.  The stove had been -- I mentioned

22  that this double oven had been removed and was replaced

23  with an ordinary range.  The electrician was very concerned

24  about the way that had been hooked up and considered that

25  to be a fire hazard, and he re-did that for me.  Then

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 21 of 131

21

1 you'll see a payment in December 15 to State Farm

2 Insurance.  As I mentioned earlier, the plumbing charges.

3       And then I consulted with a gentleman by the name of

4 Rick Allen.  I needed somebody -- I couldn't -- I didn't

5 see that it made sense for me to do more than periodic

6 inspections out there, but I needed somebody, sort of a

7 maintenance person who could go out there, check on the

8 property, keep up the property, and that was this person

9 Rick Allen.  And you'll see several payments to Mr. Allen

10 along.  He's maintained the lawn this summer.  I had him at

11 one point do sort of an overall grounds maintenance where

12 he trimmed bushes, cleaned out gutters, you know, mowed,

13 got rid of brush, limbs, and so forth that were done.  And

14 those expenditures are reflected on here as well.

15       It became apparent that the taxes on this property

16 had not been -- these are the land taxes now -- had not

17 been paid for several years.  And I discovered that, in

18 fact, the property was slated to be sold for taxes.  A

19 Jefferson County tax attorney had turned it over for a tax

20 sale.

21       And at that point, Mr. Rooney paid directly for the

22 taxes that were in arrears that were causing the property

23 to be sold.  And for some reason -- I was look for that

24 here a minute ago.  I don't see the exact amount of that

25 that they paid, but I'm sure they'll be able to tell the

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 22 of 131

22

1    Court what that was.  But --

2         Q       Do you know approximately how much it was?

3         A       I was thinking it was in the neighborhood of

4    seventeen thousand dollars.  Now, that's approximate.  But

5    the problem in this case is, in part, Mr. Gray became ill

6    here recently.

7         There's a period of time when Mr. Hood had exclusive

8    possession of this property.  And apparently, for some

9    portion of that time, he was renting it, had it on the

10   rental market.  I think he said with Timber Tops Realty.

11   But then at some point -- and I don't know when -- he moved

12   into the property and was living there.  And so during that

13   period of time, there was no income to the partnership at

14   all.

15        But my opinion at this point is that there needs to

16   be a considerable influx of capital to get this property up

17   and operating.  As you can see in the accounting, there are

18   still taxes owing in the amount of some thirty-seven

19   thousand dollars to Jefferson County.

20        There are -- on the last page, you'll see where

21   we've listed the indebtedness claimed by the Douglas Lake

22   Resort Owner's Association in the amount of forty-eight

23   thousand dollars.  And I had questioned that, but all of

24   the owners up there were assessed very large amounts that

25   had to do with the reconfiguration of the subdivision and,

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 23 of 131

23

1   I guess, the infrastructure, so there's considerable

2   indebtedness.

3        We have learned since I did this that the State of

4   Tennessee has asserted a state tax lien in the amount of

5   seven and forty-six dollars and forty-six cents, and I have

6   that statement from the State of Tennessee if you want

7   that.

8             MR. TAYLOR:  Can you make that the next

9        exhibit to your testimony, please.

10   (Exhibit No. 3 was filed.)

11   BY MR. TAYLOR:

12        Q      Were there any other areas of disrepair

13   where maintenance had not been performed in the house that

14   you identified?

15        A      Well, I think I mentioned most of them, but

16   one of the major expenditures is going to be the HVAC

17   system, the heat and air system.  Basically, they need to

18   be replaced.  I'm not sure when the house was built, but

19   you notice on my accounting I list, depending on the

20   quality of the units, I've gotten quotes where it will be

21   either twelve -- around twelve thousand dollars or twelve

22   and a half thousand dollars to replace the heat and air.

23        It will cost about three thousand dollars to build

24   this fence that I'm talking about and access to the water.

25   It's just, the way it's situated now, I would term it as an

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 24 of 131

24

1   attractive nuisance.  If you had children in that house --

2   now, there are other ways down to the water.  There's a way

3   down off of a side path.  But if you had children staying

4   in that house, they would be drawn to that point to go out

5   to the lake there, and it, in my opinion and in the opinion

6   of others who I've consulted, it's just -- it's just

7   dangerous.  There needs to have a fence there and some

8   steps.  And so the quote for that that's three thousand

9   dollars.

10       The double oven ought to be replaced.  That range

11  that's in there doesn't fit with the decor.  It's far

12  inferior to the appliances that are there generally.  It

13  just doesn't fit in.  It looks -- it just sticks out.  And

14  I got a quote, fourteen hundred and eighty-nine dollars to

15  replace that.

16       And then I've listed also -- I believe the whole

17  house needs to be professionally cleaned, somebody

18  something like Service Master that comes in and does

19  everything.  And, I mean, I'm talking carpets need to be

20  cleaned, you know, just a total stem to stern cleaning.

21       Q      Do you have a total amount of money it's

22  going to take to get this house back on the market?

23       A      Well, excluding my fee for the work that

24  I've done and excluding the work that my attorney has done,

25  it's going to take -- I think realistically, it's going to

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 25 of 131

25

1   take somewhere in the neighborhood of seventy-five

2   thousand, maybe eighty thousand to eighty, ninety thousand

3   dollars to get it to where it can be rented.

4        You know, it's a unique house.  It's huge.  It has

5   at least eight bedrooms.  It's not the kind of house that

6   you can rent for a weekend to a couple for a hundred and

7   twenty-five dollars, hundred and fifty dollars a night.  I

8   mean, you're not going to come out that way.  So it's got

9   to be marketed to groups.  I think it needs to be marketed

10  to family reunions, wedding groups, small business

11  retreats, that kind of thing.  It's got to have -- you

12  know, it's got to have good working heat and air.

13       And I'm concerned about the water system.  It's -- I

14  don't know how old that system is.  It seems to be working

15  now.  The plumber says there was a leak in one of the

16  pumps, and he's gotten that squared away, but I'm concerned

17  about that.  I don't have a quote to replace that, and I

18  don't know what it would take, but that's something that

19  needs to be looked at.

20       Q       What's the water source?

21       A       I believe it's a well.

22       Q       Were you able to determine if anything had

23  been removed from the house as it was originally furnished?

24       A       No, I wasn't, because I really -- even

25  though I was furnished with some photographs, I believe,

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 26 of 131

26

1    that showed it early on, it didn't appear to me that

2    furnishings had just been carried out, but I can't really

3    speak to that because I'm not positive what all was there.

4    It certainly had not been stripped of its furnishings.  I

5    mean, the dishes, at least part of the dishes were still

6    there in the kitchen.  The furniture appeared to still be

7    there, but the house has got some wear and tear on it and

8    some of those -- some of those furnishings are probably due

9    to be replaced.

10                MR. TAYLOR:  Okay.  Your Honor, if I could

11           just confer with my client for just a second, I may

12           be done.

13                THE COURT:  Okay.

14    BY MR. TAYLOR:

15        Q    Mr. Ripley, were you able to look at the

16    website to rent this house with?

17        A    Yes.  I found something on the Internet in

18    the way of a -- I'm not sure it was a website, per se, but

19    something indicating that the house had been rented.  And I

20    don't really recall what it was I saw.  Now, in the packet

21    of materials that were given to me by Mr. Gray, the

22    indication was that Timber Tops had been used as a rental

23    company.

24        Q    I guess what I'm asking is, you weren't able

25    to identify any furnishings that were -- maybe photographs

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 27 of 131

27

1    on the Internet that were not in the house once you took

2    possession?

3          A       I don't recall that.  I don't recall that.

4          Q       Okay.

5          A       I vaguely recall Mr. Rooney, Mr. David

6    Rooney mentioning something to me about photographs that he

7    had or had seen that he compared to what was there in the

8    house.  My impression was -- I mean, you don't know what

9    you're going to find.  These parties have been in dispute.

10   I didn't know what to expect.  When I took possession of

11   this house, I didn't know whether it would be trashed, for

12   lack of a better term.  It had not been trashed.  And it

13   appeared to me that the furnishings were, at least for the

14   most part, in place.  There weren't rooms that didn't have

15   furniture, for instance.

16         Q       Okay.  Have we provided as exhibits

17   everything you have to go with your report?

18         A       I believe so.

19         Q       Do you have anything else to add to your

20   report to the Court?

21         A       I don't believe so.  At this point, no.

22               MR. TAYLOR:  Your Honor, that's all I have

23         of this witness at this time.

24               THE COURT:  Mr. Hood, you're up.

25               MR. HOOD:  Bear with me.  I'm not quite sure

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 28 of 131

28

1       how this all goes, so --

2                   THE COURT:  What you want to do is ask him

3       questions.

4                   MR. HOOD:  Okay.

5                   THE COURT:  Most non-lawyers start out with

6       some long statement and say, isn't that true, or

7       something.  You need to ask a question, if you can.

8       Go ahead.  We'll try to work through it.

9                        CROSS-EXAMINATION

10      BY MR. HOOD:

11          Q       Okay.  You said that Mr. Gray's client,

12      which is me -- I need to ask a question.  You said

13      Mr. Gray's client, which was me, didn't provide the

14      information to Mr. Gray.  I actually did provide the

15      information to Mr. Gray, and it was not -- it wasn't given

16      to you in a timely manner, but that was not because it

17      wasn't given to him, so --

18          A       Well, if that's a question --

19          Q       That's a statement.

20          A       -- I guess what I would say is, I didn't

21      deal with you directly.  I dealt with Mr. Gray.

22          Q       Uh-huh.

23          A       And so as regards your working relationship

24      with him, I wouldn't know about that.

25          Q       Let me rephrase it.  Did you say that

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 29 of 131

29

1    Mr. Gray said to you that I did not provide the information

2    that he asked for?

3         A        Yes.  What he told me was that he was having

4    difficulty getting information from you.  And as a matter

5    of fact, when he provided me with information, he was, on

6    at least one occasion, apologetic and essentially said, you

7    know, I'm not getting the kind of cooperation that I need.

8              MR. HOOD:  So, Your Honor, how do I verify

9         that if Mr. Ross is no longer with us?

10             THE COURT:  Well, I suppose that you will

11        want to say something about that yourself and that

12        you are cooperating or something to that effect.

13             MR. HOOD:  I gave all -- yeah.  Mr. Ross was

14        given all the information right from the beginning,

15        everything I had.

16             THE COURT:  Well, let me say that what

17        you're talking about had something to do with this

18        motion in limine, okay, and stuff like that, not

19        furnishing the documents.  I mean, I don't think

20        that question's going to be very important --

21             MR. HOOD:  Okay.  That's fine.

22             THE COURT:  -- in this case, so you --

23    BY MR. HOOD:

24        A        Well, for instance, let me say this.  I have

25    a letter here that Mr. Gray wrote.  It may be the cover

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 30 of 131

30

1   letter on the documents that were provided.  This is a

2   letter that Mr. Gray wrote to you on March the 4th, and he

3   says, Dear Allen, I am now in receipt of the documents you

4   left in the drop box; however, in the future, please advise

5   my office that you've left documents in that box.  We do

6   not check it on a daily basis.  With regard to the

7   information requested, we are still in need of the

8   following.

9        Now, when he -- when I had discussions with him, he

10  was saying, I'm still trying to get this.  Here he is

11  writing a letter to you in March of 2015 saying, We are

12  still in need of the following.  A name of the contact

13  person at Timber Tops, a copy of the bank records.

14       You know, you apparently had told him that the

15  rental company was Timber Tops.  You had told him that the

16  bank account was at SunTrust, but what he was saying to you

17  is, what I was saying to him, and that is, I need full

18  information about this property.  I need to know the

19  contact person at Timber Tops.  I need the bank records.  I

20  need the bank statements.

21       So that's this letter of March the 4th of 2015.  He

22  says, In addition, you neglected to include income, costs,

23  and expenses relative to that property.  The sense that I

24  got -- and this again is a letter from Mr. Gray to you --

25  I'll be glad to provide it to the Court.  That this is --

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 31 of 131

31

1    this is his letter to you insisting that you cooperate.  I

2    offer that as the next exhibit, if the Court wants it.

3    (Exhibit No. 4 was filed.)

4    BY MR. HOOD:

5         A      And that to me, Mr. Hood, gave validity to

6    what Mr. Gray was telling me about his inability to get

7    documents and materials from you.  I mean, if I hadn't seen

8    that letter, perhaps I would have thought, well, I can't

9    judge who's not doing what they're supposed to.  Maybe

10   Mr. Gray's not doing what he's supposed to.  Maybe

11   Mr. Hood's not doing what he's supposed to.  Well, when I

12   see a letter written to you in which he's complaining to

13   you that you are not providing the information that he

14   needs, that lent a lot of credibility to his -- to what he

15   was telling me.

16        Q      Okay.  In regards to the house, you said it

17   was -- needs to be cleaned.  The day that you looked at it,

18   it didn't look like it was professionally cleaned?  Because

19   the day before it was professionally cleaned.

20             MR. TAYLOR:  Your Honor, is that a question

21        or a statement?

22             MR. HOOD:  That's a statement.  I don't know

23        how to ask the questions.

24   BY MR. HOOD:

25        A      I would say this, the house was not filthy

32

1    dirty.  The kitchen -- you know, the dishes were clean,

2    etc., etc.  What I'm saying is that before I would put it

3    on the rental market, I would have a professional cleaning

4    done.  I mean, there were places where I found cobwebs.

5    There's dust.  I think, you know, when you offer a property

6    to the general public for rental at the kind of rates that

7    you're going to ask for, for this type of house, it has to

8    be first class.

9          Q      Okay.  And also, the -- where you're talking

10   about having the steps going down to the path or to the

11   deck down there --

12         A      Yes, sir.

13         Q      -- is there not another way to get down

14   there by a golf cart pathway that goes all the way down to

15   it?

16         A      There is.

17         Q      Okay.

18         A      You can go off the side and then come

19   around.  There's a little pathway.

20         Q      Like a golf cart size all the way down to

21   it?

22         A      But the problem is that, I just don't see

23   children following that pathway.

24         Q      Okay.

25         A      What it would appear, in my experience as a

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 33 of 131

33

1    father, is that, hey, there's the lake.  Let's just take

2    off, and I just saw all kinds of problems with them falling

3    off of that abrupt bank and --

4         Q        Were you aware --

5         A        -- it just wasn't safe.

6         Q        -- were you aware that the lawn was also

7    included in the HOA?

8         A        I'm sorry.  Say that again.

9         Q        Were you aware that lawn maintenance was

10   included in the HOA?

11        A        Well, they told me that, and they actually

12   did mow it one time.  But I think they decide -- they

13   must -- well, I don't know what -- I'd be speculating.

14        Q        Right.

15        A        All I know is, the lawn was getting grown

16   up.  It wasn't being taken care of, and that's when I got

17   the gentleman, Mr. Allen, to go out there and take care of

18   it.

19                 MR. HOOD:  Okay.  No further questions.

20                 THE COURT:  All right.  Okay.

21                 MR. TAYLOR:  I have no questions of

22        Mr. Ripley.

23                 THE COURT:  Thank you.

24                 THE WITNESS:  Am I free to go?

25                 THE COURT:  Yes.

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 34 of 131

34

1        ·THE WITNESS:  Thank you, Your Honor.

2            THE COURT:  Have a good day.

3   (The witness was excused.)

4            MR. TAYLOR:  Thank you, Jim.  I'd like to

5       call Mr. Arthur Rooney.

6            THE COURT:  Mr. Rooney, have a seat.

7                ARTHUR ROONEY,

8       the next witness called on behalf of ·Abbacas,

9       having been first duly sworn, was examined and

10       testified as follows:

11                DIRECT EXAMINATION

12  BY MR. TAYLOR:

13       Q      Will you state your full name for the

14  record, please?

15       A      Arthur Redvrs Rooney.

16       Q      And what's your middle names?

17       A      Redvrs, R-E-D-V-R-S.

18       Q      Redvrs.  Mr. Rooney, where do. you reside?

19       A      I reside in England.

20       Q      The address?

21       A      .My address is Oakwood, Appley Lane North,

22  Appley Bridge, Lancashire, and the zip is WN6 9AQ.

23       Q      How do you spell Lancashire?

24       A      L-A-N-C-A-S-H-I-R-E.

25       Q      Thank you.  And, Mr. Rooney, will you please

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 35 of 131

35

1    tell me what your affiliation with Abbacas Holdings Limited

2    is?

3         A        It's my company.

4         Q        It's your company, and do you own all the

5    shares in that company?

6         A        Yes.

7         Q        And do you operate that company?

8         A        Yes.

9         Q        And what does that company do, Mr. Rooney?

10         A        It's purely and simply a holding company,

11    and for -- for whatever I want to put into it.

12         Q        What kind of work do you do, Mr. Rooney?

13         A        Well, I'm retired now, but for many, many

14    years I was a banker in African Caribbean, and then after

15    that, I was dealing in real estate chiefly in Florida and

16    also rentals in Florida.

17         Q        Okay.  Can you tell me how you got involved

18    with Mr. Hood and these projects that we're talking about

19    here in Tennessee?

20         A        The market in Florida was becoming very

21    expensive for buyers, and they were building so many

22    properties it was obvious the rental income occupancy would

23    decrease.  And most people who were buying my market

24    were buying for rental purposes.  And I looked at other

25    areas to see where -- what would work, and I -- to

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 36 of 131

36

1    Tennessee because I thought because of Dolly Parton and the

2    Smokies it would be the best location where my clients

3    could buy a property, enjoy a great location, and enjoy

4    rental income.  The rental income would never cover all

5    their operating costs.  Because of that, I met Allen Hood.

6         Q        How did you meet Mr. Hood?

7         A        I met him in Florida many years before when

8    my son and I came up to have a look at Tennessee.  Because

9    we known him in Florida, we knew he was here, we contacted

10   him.  He told me he had a piece of land which was over ten

11   acres and he had planning permission for it, but it was

12   thirty-three units and would I be interested.  He took us

13   to see the land.  Good location.  Great views.  I said,

14   yes.  And we worked out a deal, and we reached an agreement

15   that I would do the marketing in the UK for the properties.

16             MR. TAYLOR:  Your Honor, may I approach the

17        witness?

18             THE COURT:  Yes.

19             MR. TAYLOR:  I'm going to offer -- I believe

20        the best way is to call this Exhibit A to his

21        testimony, that being that it's got counterparts and

22        they are numbered so that when there's a document

23        numbered 1, it will be A-1.  Does that make sense?

24             THE COURT:  If you're going to put them, why

25        don't you just have them all marked, so she won't --

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 37 of 131

37

1        MR. TAYLOR:  Just make it a collective

2    exhibit.

3        THE COURT:  Well, it's not -- but she can do

4    them one after another.  Then you won't have to deal

5    with her again.  She's very efficient.

6        MR. TAYLOR:  Well, there's 30-some exhibits.

7        THE COURT:  Okay.

8        MR. TAYLOR:  It would be easier to do it

9    collectively, I believe.  Exhibit A collective.

10  (Collective Exhibit No. A was filed.)

11  BY MR. TAYLOR:

12       Q      Mr. Rooney, do you have this Exhibit A

13  Collective that we're talking about?  Do you have a copy?

14       A      Yes.

15       Q      Okay.  So you're referring to on April the

16  5th, 2005, Document 1, what is that document 1?

17       A      That is an agreement signed by Allen and

18  myself dated the 5th of April, 2005.

19       Q      Okay.  Is this the agreement that you're

20  talking about?

21       A      Yes.

22       Q      And can you tell me generally what the terms

23  are of the agreement?

24       A      It appointed me as the exclusive agent for

25  the sale and marketing of all units in the property, and it

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 38 of 131

38

1    offered -- and it also gave an exclusive right of sale for

2    all buyers originating from the UK, because they would come

3    as a direct result of my marketing.  And that was

4    irrespective of whether the buyer went to directly or came

5    to me.  There was a price list attached to it.  It also

6    gave compensation.  It gave bonuses.  Pretty complex.

7         Q        Okay.  And that agreement is signed by who?

8         A        It's signed by Hood and myself.

9         Q        Okay.

10        A        It was also notarized by Diane Abrams.

11        Q        Now, if you look at the first paragraph, it

12   says that this agreement is -- who are the parties in this

13   agreement?

14        A        Between Allen Hood and Arthur Rooney and

15   Just Tennessee Limited or other parties as designated by

16   Rooney.

17        Q        Okay.  And did you designate another party

18   to operate this business?

19        A        No.  Just Tennessee, and basically, it was

20   going to be a company we're buying, we would do rentals

21   into the properties at Summit View.

22        Q        And is Just Tennessee held by Abbacas?

23        A        That's -- that's me as well.

24        Q        All right.  I believe Exhibit 2 is -- will

25   you just tell the Court what that is?

39

1          A       That's a plan -- a plan of the land is 2 --

2     Exhibit 2 and 2A.   There's two separate plans of the land.

3     One was the initial plan, and then it was revised.   It was

4     revised because Hood said initially he had approval for

5     thirty-three units and they'd be numbered one to

6     thirty-seven, but the cabins would be built on a number of

7     the units, and -- but then he -- it was revised then to

8     take -- be thirty-two cabins only.

9          Q       Okay.   And is this Summit View, is that the

10    name of the development?

11         A       This is Summit View, yeah.

12         Q       And that's really what most of the topic is

13    about; is that correct?

14         A       This is what -- all the sales were done in

15    Summit View.

16         Q       Okay.   And subsection 3 to this exhibit,

17    will you please tell the Court what that is?

18         A       That is dated the 7th of January, 2006, and

19    it's from Allen Hood, again signed by myself as accepting.

20    He agrees that Hood's company, Incred-I-Builders would

21    construct the homes.   It's specifies the types of homes and

22    the total sum involved, and it gives the price, the bonuses

23    that would be applicable and just general information on

24    specifying on the sales.

25         Q       Okay.   And Exhibit 4, can you tell --

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 40 of 131

40

1        A        Exhibit 4 is a -- just the homes and the

2    price was to -- the Summit View price, the basement price,

3    and the sale price.  It's just a price list.

4        Q        Okay.  Now, when we look at Exhibit 5, can

5    you tell me which house -- which property this settlement

6    statement is for?

7        A        This relates to 1253 Stetson Lane, which is

8    now, of course, 1015 Willard Way.  And it was the

9    Settlement Statement whereby the house was purchased.  It

10   was purchased in the name of Destiny, Inc., and the seller

11   was Dale and Danette Martin.  The total price was six

12   hundred and forty-seven thousand nine hundred and

13   eighty-four dollars and seventy cents.

14       Q        Tell me about Destiny, Inc.

15       A        Yeah.

16       Q        What is Destiny, Inc.?

17       A        Destiny, Inc., was a company set up which

18   Allen Hood set up for me, and there were two shares

19   issued.  I have a share certificate.  I don't know who's

20   got the other share certificate.

21       Q        Okay.  So you said fifty percent is owned by

22   who?

23       A        By Abbacas.

24       Q        By Abbacas?

25       A        Yes.

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 41 of 131

41

1      Q      Okay.  And you don't know who the other

2  owner is?

3      A      No.  Because the other share certificate is

4  signed, and I've never seen it since.

5      Q      And No. 6?

6      A      That's the Share Certificate which was

7  signed by Hood and I and for Abbacas.

8      Q      And this basically shows the ownership

9  interest in Destiny, Inc.; is that correct?

10     A      Yeah.

11     Q      All right.  Let's look at No. 7.

12     A      Yeah.  This is another letter from Hood

13 dated 10th of October, 2007.  This was addressed to my bank

14 in England, HSBC.  And we were having -- I built up a

15 considerable debt overdraft for marketing costs, etc., and

16 I needed something from Hood which specified what was

17 outstanding for the bank, so the bank would be happy,

18 because money was not coming in as it should have done.

19 And Hood wrote -- I told Hood what the problem was, and he

20 wrote this letter in which he specified and seven buyers

21 were -- the commission on those was due, and he specified

22 the name of the buyer and the amount of the commission,

23 which it was totaled two hundred and sixty-one thousand

24 eight thirty-one.

25     Q      And that commission is due to who?

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 42 of 131

42

1          A       That was due to me.

2          Q       And is that through your agreement, which

3    was the first agreement?

4          A       Yes.  And he also confirmed in that letter

5    that there was a further commission due of six thousand

6    dollars on each furniture pack installed.

7          Q       Okay.  And let's look at Exhibit 8 to

8    your --

9          A       This is an affidavit prepared by Edward

10   Hamilton and which I requested because I didn't know what

11   was going on, and that was in 2008.

12         Q       So Mr. Hamilton -- who did Mr. Hamilton

13   represent?

14         A       Me.

15         Q       Okay.  And No. 9 is also a letter from

16   Mr. Hamilton --

17         A       Yeah.

18         Q       -- Attorney Ward Hamilton?

19         A       Yeah.

20         Q       To?

21         A       Again, this is to Melinda Meador of

22   Winchester, Sellers, Foster, and Steele regarding Douglas

23   Lake Resort Owners Association.  And Allen Hood, in 2008,

24   due to concerns that Hood might cause an unauthorized

25   transfer of the, my client, Arthur R. Rooney, a shareholder

43

1   in Abbacas Holdings, Inc., caused an affidavit to be filed

2   indicating his fifty percent ownership in Destiny.  That

3   was the previous document we were referring to.

4          It also says that on January the 8th, 2009, Allen

5   Hood caused to filed an affidavit, purporting to be

6   declared by J. Patrick Hamilton, Attorney at Law, stating

7   that Destiny of Tennessee, LLC, was a successor by

8   conversion of Destiny, Inc.

9          And again -- can I read this?

10     Q       Go ahead.

11     A       On April the 2nd, 2009, Hood caused to be

12  recorded a Deed from Destiny of Tennessee, LLC, a Tennessee

13  Limited Liability Company (formerly Destiny, Inc.) to Lake

14  Casa Limited Partnership, a South Dakota Limited

15  Partnership, oddly having the address of 431 Thomas Loop

16  Road, Sevierville.  Mr. Hood executed this deed on the 4th

17  of March, 2009.

18     Q       Okay.  Who found out about this succession?

19  As I understand it, Destiny, Inc. --

20     A       Yeah.

21     Q       -- converted to Destiny of Tennessee, LLC,

22  and then conveyed the lake house property to Lake Casa

23  Limited Partnership; is that correct?

24     A       And Edward Hamilton found out, but we -- and

25  I'd been -- I'd been taken very ill, and I was -- I

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 44 of 131

44

1    needed -- I asked my son to check, and he made some

2    inquiries as well.

3         Q       Now, you provided a stock certificate where

4    Destiny, Inc., is one-half owned by Abbacas, correct?

5         A       Yes.

6         Q       Were you provided a one-half membership

7    interest in Destiny of Tennessee, LLC?

8         A       No.

9         Q       Were you provided any sort of interest in

10   Lake Casa Limited Partnership?

11        A       No.

12        Q       So basically, you no longer own the one-half

13   interest; is that correct?

14        A       No.

15        Q       All right.  Okay.  Let's look at

16   Exhibit 10.

17        A       This is a Tennessee Quitclaim Deed, and the

18   grantor is Tennessee -- Destiny of Tennessee, LLC, and the

19   grantee is Lake Casa Limited Partnership, and it's

20   transferring the property of Douglas Lake, Lot No. 5, which

21   is 1251 Stetson Lane, 1015 Willard Way, and to Lake Casa

22   Partnership by Hood.

23        Q       Okay.  Will you just identify what

24   Exhibit 11 is for the Court, please?

25        A       Sure.  It's a letter from the Tennessee

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 45 of 131

45

1  Valley Title Insurance addressed to Michael Winchester,

2  Winchester, Sellers, Foster, and Steele, and it confirms

3  that the property is vested in Lake Casa Limited

4  Partnership in South Dakota.

5       Q  Okay.  Let's look at No. 12.  Will you

6  please tell me what No. 12 is, Exhibit 12?

7       A  Yes.  This is an email which Hood sent to me

8  on the 7th of October, 2009, at 1719 hours.  That's UK

9  time, sir.  Arthur, Sorry to hear you are not feeling

10  well.  I'm requesting that Abbacas or whatever company

11  filed a letter through Ward Hamilton against the

12  1253 Stetson, stating I was not allowed to borrow against

13  the house to be removed.  I am leveraging two hundred

14  thousand dollars of the property which will stay in their

15  bank in a CD form to ensure the payment on my personal

16  house and Lot 9.  Please respond quickly so I know what my

17  next step is.

18       Q  Did you respond to that email?

19       A  No.

20       Q  Did you give him permission to take a

21  mortgage out against the lake house?

22       A  No.

23       Q  Okay.  Will you please look at Exhibit 13?

24       A  This is a letter from Edward Hamilton

25  addressed to the Secretary of State, Department of Business

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 46 of 131

46

1    Services in Nashville.  The heading is Destiny of

2    Tennessee, LLC (Formerly Destiny, Inc.).

3         My client is a shareholder in Destiny, Inc.

4    Unbeknownst to him, the name of this company was changed by

5    another shareholder to Destiny of Tennessee, LLC.  My

6    client is concerned about this change and would like to

7    obtain all related information.  Enclosed is my check,

8    etc., etc.

9         Q     Okay.  So did you instruct Mr. Hamilton to

10   make inquiry of --

11        A     Yes.

12        Q     -- the Secretary of State?

13        A     Yes.

14        Q     And No. 11, will you please identify what

15   that document is?

16        A     Yes.  This is again from Edward Hamilton to

17   Winchester, Sellers, Foster, and Steele.  The heading is

18   Douglas Lake Resorts and confirming that Edward Hamilton

19   represented myself, Abbacas Holdings, which is a fifty

20   percent shareholding in Destiny, Inc., and refers to the

21   two documents which they're holding.

22        Q     Will you look at paragraph 3, please.  Will

23   you read that, please?

24        A     Paragraph 3?

25        Q     Yes.

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 47 of 131

47

1      A      On June 30th, 2008, due to concerns that

2    Mr. Hood might cause an unauthorized transfer of property,

3    my client, Arthur R. Rooney, a shareholder in Abbacas

4    Holding, Ltd., caused an affidavit to be filed indicating

5    his fifty percent share ownership in Destiny, Inc.

6      Q      Okay.  Will you please take a look at some?

7    They're just to speak for themselves.  Let's look at

8    Exhibit -- look at Exhibit 17.  What is that?

9      A      This is an affidavit from myself which --

10      Q      It's in this lawsuit, is it not?

11      A      Yes.

12      Q      Does it not refer to the lawsuit?

13      A      Yes.

14      Q      I think the document speaks for itself.  Do

15    you recall the circumstances under which you gave this

16    affidavit?

17      A      Yes.  Just the concern about the fact that

18    Hood had -- Hood had stolen the property.

19      Q      Okay.  Will you please identify, just

20    identify what Exhibit 18 is, please?

21      A      This is the Order for the Receiver to be had

22    on the -- after a hearing on the 6th of June, 2014.

23      Q      Okay.  Will you please identify Exhibit 19

24    for the Court?

25      A      Order Granting Motion for Summary Judgment.

48

1      Q       Okay.  Identify Exhibit 20, please.

2      A       Order Divesting Property Interest.

3      Q       Do you know what that order is?

4      A       Yes.  That was the Court ordering the fifty

5  percent of the property should be taken from Hood -- from

6  Lake Casa Limited Partnership and vested in myself and

7  Abbacas.

8      Q       Okay.  Do you know if that was recorded with

9  the Register of Deeds in Jefferson County?

10     A       I think it was.  I think it was.  Yeah, it

11 was.

12     Q       Okay.  Will you please identify Exhibit 21?

13     A       21 is an email which was sent to Jim Ripley

14 and from Doug Taylor and copied to myself, and he forwarded

15 an email from a realtor called Kim Hazel and --

16     Q       Can you tell me what the purpose is?  Does

17 it involve the insurance certificate?  Is that the issue?

18     A       No.  It was the fact that the HOA -- it was

19 the change in the address really from Stetson Lane to

20 Willard Way, and we did -- there was a picture of eight

21 cars at the property.

22     Q       What was the issue -- seems like at one time

23 it was 1015 Willard Way and then it was 1051 Willard Way?

24 Is that just --

25     A       I think --

49

1      Q        -- a mistake?

2      A        -- I've been -- I think it was a mistake.

3  I'd just been given the wrong number.

4      Q        Okay.  And let's just identify Exhibit 22,

5  please.

6      A        22 is a Real Estate Assessment Data, and

7  which is addressed to Lake Casa Limited Partnership for the

8  year 2015.

9      Q        All right.  And 23 is an email?

10     A        Yes.

11     Q        Can you talk about Exhibit 24, please?

12     A        24 is a Snapshot of RentalHouses.com, refers

13  to 1015 Willard Way, confirms that -- it's handwritten

14  information on somebody called Tyler -- Tyler Hitt was

15  renting the property from Allen Hood and paid nine thousand

16  dollars for three months rent, and he was covering the

17  insurance and utilities himself.  It also confirmed on --

18  it said prior to November 2014, Timber Tops Rental were

19  charging fifteen hundred to nineteen hundred dollars a

20  night.

21     Q        Okay.  Let's look at Exhibit 25, please.

22  Just identify what that is.

23     A        A letter from Jim Ripley -- a letter from

24  Sharp and Ripley and to Ross Gray.

25     Q        Okay.  There is something attached to that

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 50 of 131

50

1    letter.  Can you identify that please, 25?

2         A       Yeah.   There is an agreed order attached to

3    the letter.

4         Q       All right.   26, identify that document to

5    the Court, please.

6         A       An Amended Order of Receivership.

7         Q       Okay.   27?

8         A       A letter from Woolf McClane to Ross Gray.

9         Q       And who is that from?

10        A       It's from Greg Logue.

11        Q       Who's counsel for the receiver; is that

12    correct?

13        A       Yes.

14        Q       And again, 28, will you identify that

15    letter, please?

16        A       Another letter from Woolf McClane.  This one

17    includes Writ of Possession.

18        Q       From Mr. Logue?

19        A       Yes.

20        Q       Who is that to?

21        A       That again is to Penny Murphy, Jefferson

22    County General Sessions Court of Dandridge.

23        Q       Okay.   And is there a Writ of Possession

24    attached to that?

25        A       Yeah.

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 51 of 131

51

1      Q      Okay.  And 29, will you please just read --

2  just read what the title is, please?

3      A      Receiver's Motion to Assess Expenses to

4  Parties.

5      Q      Okay.  That was what Mr. Ripley talked

6  about.  Identify No. 30, Exhibit No. 30.

7      A      Order Authorizing Assessment by Receiver.

8      Q      Okay.  And Exhibit 31, will you please talk

9  about what that is?

10     A      This is another -- this is an email from Jim

11  Ripley, and it's to Doug Taylor and to myself and to Ross

12  Gray.  And it basically says, I've received a total of

13  eleven thousand dollars from the Rooneys.  Although

14  Mr. Hood has been assessed ten thousand dollars, he's paid

15  nothing.  We presently have the sum of nine thousand two

16  thirty-seven dollars fifty-six cents on hand.

17        And it goes on about the points that Jim Ripley made

18  before about the state of the property.

19     Q      And what is Exhibit 32?

20     A      32 is a confirmation from Jefferson County

21  Chancery Court that we paid seventeen thousand two

22  ninety-two dollars and fourteen cents to cover the back

23  taxes.  I believe it was for 2008 and '9, which Hood had

24  not paid, despite the fact he was in control of the

25  property.

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 52 of 131

52

1         Q        Okay.  Let's talk about the lake house, the

2    1015 Willard Way house.

3         A        Yeah.

4         Q        Did you receive any commissions from --

5         A        Yes.

6         Q        Do you have an accounting of that?

7         A        Yes.

8         Q        What is that?  What document are you looking

9    at?  Summary of --

10        A        That's B.

11        Q        -- Summary of Claim Relating to 1015 Willard

12   Way, Douglas Lake?

13        A        Yeah.

14        Q        Is that this document here?

15        A        Yes.

16             MR. TAYLOR:  I'd like to make that

17        Exhibit B.

18   (Exhibit No. B was filed.)

19   BY MR. TAYLOR:

20        A        That itemizes the lot numbers and the names

21   of the buyers, the commission initially offered by Hood,

22   and the revised commission, which left a shortfall of six

23   hundred and ten thousand three hundred and fifty-four

24   dollars.  The total commission was due was eight

25   ninety-four dollars three one six.  And it also shows the

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 53 of 131

53

1    commission of back payments which Hood had made.  It shows

2    two commission payment advances, one of fifty-one thousand

3    nine twenty-seven, and one of seventy-eight thousand five

4    ninety-six.  Then it shows four payments made to my

5    designate, OVR, payment agreed point, which is my

6    designate, payment on Lot 17, which is a deduction, and

7    again, on another payment.  Total amount paid -- that Hood

8    paid on that -- being paid on that directly or indirectly

9    was two ninety-four thousand one hundred and thirty-seven,

10   which if deducted from the six hundred and ten thousand,

11   left a shortfall of three hundred and ten thousand.

12        Then we have promotional costs.  There's a

13   cancellation where one of the buyers, due to family

14   problems, cancelled, and fifty percent of the cancellation

15   fee was due to -- due to me.  I've itemized that.  Then

16   there was a payment on the lake house, which was three

17   twenty-five four one three.  That was our payment, our

18   share for fifty percent of the lake house.  We also paid

19   sixty thousand one hundred and seventy-two dollars for

20   furnishings, and we received fifty percent deduction of the

21   Realtor fee, which was six thousand -- six thousand seven

22   sixty-one.  Then we paid a third of twelve thousand eight

23   hundred and eighty-four dollars for additional furniture

24   from Winwood.  Hood, I presume, paid the other

25   fifty percent.

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 54 of 131

54

1    We then had closing costs on a number of properties,

2    which left -- taking into account all the previous -- there

3    was a balance due to Hood of a hundred and forty-four

4    thousand six sixty-seven.  But then we had subsequent

5    closings which were fifteen more property sales.

6    Commission on those amounted to one million one hundred and

7    two thousand four hundred and thirty dollars.

8    The document then shows the deduction of a hundred

9    and forty-four thousand six sixty-seven to Hood from that,

10   giving a balance of nine fifty-seven seven eight

11   sixty-three.  Then we had a promise bonus of four three

12   thousand five hundred dollars on thirty-two sales, which

13   amounted to a hundred and twelve thousand dollars.

14   Commission on twenty-nine furniture packs at six thousand

15   dollars a piece, which is -- Hood confirmed in an earlier

16   letter -- was discussed.  It amounted to a hundred and

17   seventy-four thousand.

18   There was a lot referral fee as well of twenty

19   thousand dollars per lot from Lots 26 to 31, another two

20   hundred and twenty thousand dollars.  And then there's a

21   shortchange of commission on the third batch of sales.  The

22   balance outstanding from Hood, Incred-I-Builders then was

23   one million seven hundred and forty-seven thousand seven

24   hundred and twenty-five dollars.

25          Q       All right.  I would like to show you what

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 55 of 131

55

1    will be -- we're going to offer as Exhibit C, but I want

2    you to identify it, this Collective Exhibit C.

3                    THE COURT:  How long is this going to take?

4                    MR. TAYLOR:  This won't take long.

5                    THE COURT:  Okay.

6    BY MR. TAYLOR:

7            A      Yeah.  These are warranty deeds -- general

8    warranty deeds signed by Incred-I-Builders between

9    individual buyers that we introduced.  They're not all

10   here, but the vast majority of them are.

11           Q      Are those the buyers that you referred --

12           A      Yes.

13           Q      -- pursuant to your --

14           A      Yes.

15           Q      -- agreement with --

16           A      Yes.

17           Q      -- Mr. Hood --

18           A      Yes.

19           Q      -- is that correct?

20           A      Yes.

21                    MR. TAYLOR:  I'd just like to offer these as

22           a Collective Exhibit C.

23   (Exhibit No. C was filed.)

24   BY MR. TAYLOR:

25           Q      And while I'm doing that, I would like for

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 56 of 131

56

1    you to look at that, and I'll ask you a question.

2         A        Uh-huh.

3         Q        Can you identify what these documents are?

4         A        Yeah.   These are Deal Sheets produced by

5    Hood, and they relate to the lot number, the type of house

6    that was built on the lot, or Summit View, the buyer's

7    personal information, and basically that's it.

8         Q        And do these Deal Sheets coincide with the

9    deeds we just --

10        A        Yes.

11        Q        -- introduced?

12        A        Yes.

13        Q        And do all those documents corroborate your

14   figures that you provided as exhibit to the Court?

15        A        Some of them do, and some of them don't.

16        Q        Be more specific, please.

17        A        The prices, they don't show the bonuses.

18        Q        Okay.

19        A        And some of them show the furniture, and

20   some of them don't.

21        Q        So your exhibit, which shows the money

22   that's due to Abbacas, includes additional things

23   besides --

24        A        Yes.

25        Q        -- the sale?

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 57 of 131

57

1          A       Yes.

2                  MR. TAYLOR:  All right.  And I'd like to

3          offer this as the next collective exhibit.  Is that

4          D?

5                  THE COURT REPORTER:  It is.

6                  MR. TAYLOR:  Deal Sheets.

7   (Collective Exhibit No. D was filed.)

8   BY MR. TAYLOR:

9          Q       Now, those were all provided pursuant to

10  your agreement with Mr. Hood; is that correct?

11         A       Yes.

12         Q       Take a look at and identify that for me.

13         A       This is a list of the buyers giving their --

14  the order of construction, the lot number, the cabin site,

15  whether it was a mortgage or cash, what the construction

16  was, the status, the purchase price --

17         Q       Okay.

18         A       -- the sales commission --

19         Q       That's fine.

20         A       -- and the furniture.

21                 MR. TAYLOR:  That's enough for now.  Let me

22         offer that as the next collective exhibit.

23  (Exhibit No. E was filed.)

24  BY MR. TAYLOR:

25         Q       Can you tell me in a couple of sentences

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 58 of 131

58

1    what this worksheet is?

2        A        Yeah.    It itemizes all aspects of each sale,

3    and there's a couple of minor differences between the

4    amounts on here and the amounts on the general warranty

5    deeds.    I can't remember offhand which one it is, but

6    there's one that's about two hundred dollars difference on

7    one price and I think there's two thousand dollars

8    difference on the other, but all the others are correct.

9    They all coincide.

10        Q        Does this collective exhibit corroborate the

11    previous exhibits that you've entered --

12        A        Yeah.

13        Q        -- into evidence --

14        A        Yeah.

15        Q        -- which --

16        A        Yeah.

17        Q        -- involve the costs that are --

18        A        Yeah.

19        Q        -- the amounts that are due --

20        A        Yeah.

21        Q        -- to Abbacas --

22        A        Yes.

23        Q        -- both for the operation of the lake house?

24        A        Yeah.

25        Q        And this is for the sales of Summit View?

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 59 of 131

59

1    A    No.  This is -- yes.

2    Q    This is for sales at Summit View?

3    A    Yes.  Sales -- this is sales at Summit

4    View.

5    Q    I gotcha.  I'm going to show you some MLS

6    listings and see if you can identify those, please?

7    A    This is a listing that Hood did with a

8    company called Smoky Investments [sic] Real Estate and

9    Auction, and he did this in 2009.

10   Q    What property is he listing?

11   A    This is a listing of the lake house, Stetson

12   Lane -- Willard -- 1015 Willard Way.

13   Q    The house that's part of -- that has you

14   here?

15   A    Yes.

16   Q    Okay.  So Mr. Hood was selling the house?

17   A    Yeah.

18   Q    And at that time, did you own an interest in

19   that house?

20   A    I thought I did.

21   Q    Okay.

22   A    But I didn't because he'd already

23   transferred it to his company.

24   Q    Is there more than one listing here?

25   A    No.  It's one listing.

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 60 of 131

60

1        Q      All right.

2        A      It's a listing -- one listing, but it's also

3   been confirmed by another company.

4               MR. TAYLOR:  Okay.  Let me offer that as the

5        next.  Is that E?

6               THE COURT REPORTER:  F.

7               MR. TAYLOR:  F.  Excuse me.

8   (Exhibit No. F was filed.)

9   BY MR. TAYLOR:

10       Q      So basically, Mr. Hood was trying to sell

11  the house, which you have reacquired your one-half

12  interest --

13       A      Yeah.

14       Q      -- that you originally had; is that correct?

15       A      Yes.

16       Q      All right.  Do you have anything here that I

17  haven't brought up yet?

18       A      No.

19               MR. TAYLOR:  Just a second, Your Honor.

20       Your Honor, that's all I have of Mr. Rooney at this

21       time.

22               THE COURT:  All right.  Let me ask you one

23       question.  Did you all ever have any problem with

24       Stetson as going over the lines with respect to this

25       property?

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 61 of 131

61

1           THE WITNESS:  No, not to my knowledge.

2           THE COURT:  All right.  So you got lucky and

3   escaped from Stetson.  Okay.  Do you have any

4   questions?

5           MR. HOOD:  So let me ask the question.  I've

6   got the same documentation that provides how he was

7   paid and so forth on commissions.  Can I enter that

8   into the Court.

9           THE COURT:  Well, sure, if you want.

10          MR. HOOD:  Okay.

11          THE COURT:  Okay.

12          MR. HOOD:  Because it's basically --

13                  CROSS-EXAMINATION

14  BY MR. HOOD:

15      Q     Mr. Rooney, do you recall this?

16          MR. TAYLOR:  Can I see a copy of what

17  he's --

18          MR. HOOD:  Oh, okay.  Am I supposed to show

19  him?

20          THE COURT:  You have to show it to the other

21  attorney because it hasn't been furnished.

22          MR. HOOD:  Okay.

23          THE COURT:  All right.  Go ahead.

24  BY MR. HOOD:

25      Q    Do you recall that document?

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 62 of 131

62

1          A          Yeah.

2          Q          Yes?

3          A          I don't -- I don't recall it, but I can see

4     that I signed it.

5          Q          That is your signature --

6          A          Yes.

7          Q          -- correct?

8          A          Yes.

9          Q          And that's David Rooney's signature also?

10         A          It looks like it.

11         Q          Okay.

12         A          It's not the original.  It's -- I don't know

13    what it is, whether it's a photocopy or what.

14                    THE COURT:  You have to put it in the

15          record.

16                    MR. HOOD:  Okay.

17                    MR. TAYLOR:  Your Honor, does have an -- do

18          you have an original?

19                    MR. HOOD:  I do have a copy.

20    BY MR. HOOD:

21         A          I don't -- I don't recall it.  I don't

22    recall it, but that is my signature.  But I don't know

23    whether it's a photocopy or not.  I don't know.

24    BY MR. HOOD:

25         Q          Okay.

63

1          MR. TAYLOR:  Do you have the original here?

2          MR. HOOD:  No.

3   BY MR. HOOD:

4          Q      But you verified that was your signature?

5          A      That is --

6          Q      Do you recall sitting around --

7          A      It's either my signature or a facsimile.  It

8   looks like more like a facsimile.

9          Q      Do you recall sitting around the lake house

10  table at 10 o'clock at night going through all these

11  figures and coming up with this figure right here --

12         A      When?

13         Q      -- as how the remainder of the lake house

14  would be paid for?

15         A      No.

16         Q      Okay?

17         A      Because you'd already taken the lake house

18  payment off and the furniture.

19         Q      So why would you sign a piece of paper that

20  says you --

21         A      I don't --

22         Q      -- owe three hundred thousand dollars, and

23  we're going to pay it on each deal sheet of fourteen

24  thousand dollars and some odd cents?

25         A      Because I don't recall the document.

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 64 of 131

64

1    Simple.  I mean, if -- if it is my signature, if I see the

2    original, yes, it might well be my -- but I don't recall

3    it.

4                    MR. HOOD:  Okay.  I'd like to enter that as

5         an exhibit.

6    (Exhibit No. 5 was filed.)

7    BY MR. HOOD:

8         Q      What that document says is basically --

9

10                   MR. TAYLOR:  Your Honor, he's testifying.

11                   THE COURT:  Well --

12                   MR. HOOD:  Okay.  I'm sorry.

13   BY MR. HOOD:

14        Q       That document that you just saw, what does

15   that --

16        A       The document -- that document actually

17   confirms that the commission is six thousand dollars on

18   the -- on the furniture packs.  It also confirms that the

19   lake -- there is a payment going on the lake house, which

20   is all set out in Exhibit B.  There's no disputing the fact

21   that we paid fifty percent of the cost of the lake house

22   and we paid the furniture, fifty percent of the furniture.

23   And that's shown by the figures that's deducted off the

24   commission that was owed.

25                   THE COURT:  Are we waiting on you?

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 65 of 131

65

1           MR. HOOD:  Yes, sir.  I'm -- I'm trying to

2       figure what -- how to word this.

3   BY MR. HOOD:

4       Q       The figures on that document, do they say

5   what the balance that you owed me for the remainder of the

6   lake house?

7       A       Well, if we paid fifty percent of the lake

8   house, you were to pay the other fifty percent.  And the

9   amounts our documents show that we paid was three hundred

10  and twenty-five thousand four hundred and thirteen.  The

11  cost of the furniture, fifty percent again, sixty thousand

12  one seventy-two.  So on that basis, you would have paid the

13  other three hundred and twenty-five thousand four thirteen,

14  and you've also paid sixty thousand on the furniture.

15      Q       Okay.  Let me ask you this.  These right

16  here, basically, are those the last houses that you were

17  supposed to pay --

18      A       I have no idea.

19      Q       -- for the lake house?

20          MR. TAYLOR:  Excuse me.

21  BY MR. HOOD:

22      A       No.

23          MR. TAYLOR:  Is there another document that

24      you're showing?

25          MR. HOOD:  Yes, sir.

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 66 of 131

66

1          MR. TAYLOR:  Can I see it, please?

2          MR. HOOD:  This will basically support the

3     document that's up there and provides all the

4     information of how they were paid on every deal set

5     forth in that contract there.  And then I'd like to

6     enter this also.

7          THE COURT:  You're going to introduce that

8     notebook?

9          MR. HOOD:  Yes, sir.

10         THE COURT:  Okay.

11         MR. HOOD:  This is the proof from that

12    contract.

13         MR. TAYLOR:  Are you going to introduce

14    this?

15         MR. HOOD:  Yes, as soon as you're done.

16         MR. TAYLOR:  Okay.

17         THE COURT:  What's he looking at?

18         THE WITNESS:  No.  I'm just waiting.

19         MR. HOOD:  He's got it.  He's looking at the

20    document.

21         THE COURT:  Is it one that he gave -- okay.

22         MR. HOOD:  Yes.  He asked to look at it

23    first.

24         MR. TAYLOR:  Okay.  Is your last exhibit --

25    has that been marked and given to the Court?

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 67 of 131

67

```
 1                    MR. HOOD:  Yeah.

 2                    THE COURT:  5?  Yeah.

 3   BY MR. HOOD:

 4        A        I have never seen this before, but it

 5   itemizes some of the buyers, but only some, and it also

 6   refers to -- refers to one, two, three, four, five -- seven

 7   buyers only.

 8        Q        Can you tell me how many properties are

 9   listed there?

10        A        On here?

11        Q        Yes, sir.  Just the first page.

12        A        Just the first page?

13        Q        Yes, sir.  How many properties?

14        A        One, two, three, four, five, six, seven,

15   eight, nine -- nine properties which relate to sales which

16   I did, and then there's another property here where Hood

17   has sold Lot 24 to France Stuart, Lot 36 to Allison Fornie,

18   Lot 3 to Allison Fornie.  Now, I presume that that covers

19   buyers that I introduced who have sold the properties

20   back.  I'm guessing on that point.

21        Q        So there's -- I'm sorry.  One more time.

22   Inclusive of all the properties that are listed here, how

23   many properties are listed there?

24        A        Nine of -- nine of my clients.

25        Q        Total, please?
```

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 68 of 131

68

1          A        Nine -- no.   Nine of my clients and four of

2     yours.

3          Q        Okay.   Can I see the document?

4          A        Sure.

5          Q        One, two, three, four, five, six, seven,

6     eight, nine, ten --

7          A        No.   No.

8          Q        -- eleven, twelve, thirteen --

9          A        No.

10         Q        -- fourteen -- fourteen properties total

11    here; is that correct?

12         A        One, two, three, four --

13         Q        Which --

14         A        -- five, six --

15         Q        -- correlate with --

16         A        -- seven --

17         Q        -- the document --

18         A        -- eight, nine properties that I sold.

19         Q        Okay.

20         A        And two, four, five properties that you've

21    sold.

22         Q        Okay.   So a total of fourteen?

23         A        Yeah.

24                  MR. HOOD:   Okay.   I'd like to enter this --

25             these are the last fourteen properties that were

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 69 of 131

69

1        sold --

2               THE COURT:  Okay.

3               MR. HOOD:  -- and details of how they were

4        sold.

5               THE COURT:  6.

6    (Exhibit No. 6 was filed.)

7    BY MR. HOOD:

8        Q       And --

9        A       Can I say something on that?  The

10   properties -- the five properties which he's listed as

11   being sold, he hasn't listed the commission that should

12   have come to us on those sales that we'd introduced.

13       Q       Can I ask --

14       A       The fact that -- the fact that an owner has

15   bought a property and then afterwards sold it back to Hood,

16   we're still entitled to the commission.

17       Q       Why do you think those properties were sold

18   to somebody else?

19       A       Well, because quite a lot of the owners got

20   rather cheesed off -- I'm putting it mildly -- because

21   water -- instead of each house or two or three houses

22   having their own well, it didn't work like that.  There

23   were houses running out of water.

24       Q       Because people did not --

25       A       Let me -- let me finish.

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 70 of 131

70

1          Q        I'm sorry.

2          A        Houses were running out of water because

3    they had too many houses attached to one well.  The

4    electricity, he had connected not each house with its own

5    supply but a few houses with supply and linked them --

6    linked the other houses in.  The road had never been

7    finished and was dangerous, and the water drainage on the

8    road, that surface water was not working.

9          My company, which was Just Tennessee, put rentals

10   into the property.  Every rental we had in there

11   complained, came back to me and complained, and I was

12   forced to do refunds.  So not only the owners were annoyed,

13   but they were also -- the renters were also annoyed.

14         Q        On those five --

15         A        With regard to anybody deciding to sell a

16   property at a later date, that's entirely up to them.

17   Depends on what their financial circumstances are.  There

18   might be a change.  I don't know.

19         Q        Mr. Rooney, so you're telling the Court that

20   basically you did not sell those five; is that correct?

21   You sold nine of those properties?

22         A        No.  We sold -- you've listed those five as

23   in your -- as your sale.  You haven't put the commission in

24   that's due to us on them.

25         Q        Did you sell them, or did I sell them?

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 71 of 131

71

1          A          Initially, we sold them.

2          Q          You sold them?

3          A          Yeah.  Yeah, we sold them.

4          Q          So did you close on those properties?

5          A          They were all closed.

6          Q          So they closed and resold?

7          A          The deeds -- the warranty deeds state that.

8     They were all sold to them.

9          Q          Okay.  So they were sold to individuals,

10    those five, and then how were they conveyed back --

11         A          I have no idea.  I didn't even know until

12    today that they'd moved.

13         Q          But you just said that they were sold, and

14    the warranty deed supports that?

15         A          The warranty deed is signed by you.

16         Q          A warranty deed is signed by me, correct --

17         A          Yes

18         Q          -- on those property.

19         A          On each property.

20         Q          The five that you -- that we're talking

21    about right now, how were they sold to somebody --

22         A          I have --

23         Q          -- and then turned around --

24         A          -- I have no idea.

25         Q          That's --

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 72 of 131

72

1       A       Obviously, it seems to me that the obvious

2   conclusion is that you've bought the properties back from

3   them, or they've handed them back to you, or they haven't

4   made payments on their mortgage, and you've taken them one

5   way or another, and you've unsold them to somebody else.

6       Q       So one more time, let me ask this.  Those

7   five properties that you said were sold not by you --

8   rephrase -- that were bought -- okay.  Basically, you're

9   saying that the last five properties were sold to your

10  clients and closed, and then turned around and bought by me

11  or Incred-I-Builders --

12      A       No.

13      Q       -- or whoever --

14      A       The only way you could sell a property

15  and -- those properties would be if you got possession of

16  the properties again.

17      Q       Again?

18      A       Yeah.

19      Q       So you're telling me -- do you have

20  documentation stating that you sold those five properties,

21  and I turned around and bought them back and --

22      A       It's on --

23      Q       -- resold them for --

24      A       -- it's on the Deal Sheets.  All the names

25  are there, and they're also on warranties --

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 73 of 131

73

1      Q      Okay.

2      A      -- signed by you.

3             MR. HOOD:  This right here is in regards to

4      the last fourteen properties that I'd like to

5      enter.

6             THE COURT:  That notebook?

7             MR. HOOD:  Yes, sir.

8             MR. TAYLOR:  May I see it, please?

9             MR. HOOD:  Yes.  It tells every --

10            MR. TAYLOR:  Let me look at it first.

11            MR. HOOD:  That's fine.  Oh, before I talk?

12            MR. TAYLOR:  Yeah.

13            MR. HOOD:  Okay.  Just so you understand,

14     these are the lot numbers of the last fourteen,

15     exactly what transpired and copies of checks that

16     were paid to for commissions, deal sheets, balances

17     due, copies of wire transfers, copies, everything is

18     right there.

19            MR. TAYLOR:  Your Honor, this is pretty

20     extensive.  If we're going to break for lunch, may

21     we get a copy of this and look at it.  This is a lot

22     of stuff here.

23            THE COURT:  That's okay.  Have you got

24     another witness after lunch?

25            MR. TAYLOR:  I don't know.

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 74 of 131

74

1           THE COURT:  Okay.  You going to lock it up?

2           THE BAILIFF:  Yes, sir, I can.

3           THE COURT:  We'll try to speed through lunch

4      here.  1 o'clock.

5  (A lunch break was taken.)

6           THE COURT:  I'm probably going to get it

7      marked as Exhibit G, because it's coming in right

8      after F, I think, and I got listed something like

9      Exhibit G is a house listing, which is what this is,

10     right?

11          MR. TAYLOR:  I believe it is.

12          THE COURT:  Let's mark that G.

13          MR. TAYLOR:  Is it the last thing?

14          THE COURT:  Yeah, before you went to another

15     exhibit or sometime, I guess.

16  (Exhibit No. G was filed.)

17          THE COURT:  Are you through looking at it?

18          MR. TAYLOR:  At that notebook?

19          THE COURT:  Right.

20          MR. TAYLOR:  Yes, sir.

21          THE COURT:  Are we ready to go?

22          MR. TAYLOR:  You want Mr. Rooney back up

23     there?

24          THE COURT:  You were through, right?

25          MR. HOOD:  No, sir.

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 75 of 131

75

1          THE COURT:  Well, wait a minute -- okay.

2     Well, get back up -- have you got some more

3     questions?

4          MR. HOOD:  Yes, sir.

5          THE COURT:  All right.  Go ahead.  But you

6     wanted this notebook introduced before or after or

7     right now or when?

8          MR. HOOD:  Now would be great.

9          THE COURT:  Okay.

10  (Exhibit No. 7 was filed.)

11          MR. HOOD:  If I might have the exhibit --

12     the red exhibit right there.

13          THE COURT:  Okay.

14          MR. HOOD:  The red piece of paper.

15          THE COURT:  Let me get this so it won't drop

16     off.

17          MR. HOOD:  May I approach the bench?

18          THE COURT:  Sure.  You want this right

19     here?

20          MR. HOOD:  Yeah.  I just want to explain to

21     you while you're looking at.  It's one long sheet

22     that goes -- the lines go across -- .

23          THE COURT:  Okay.

24          MR. HOOD:  -- for your information.

25          THE COURT:  All right.  What's that at the

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 76 of 131

76

1    bottom.

2              MR. HOOD:  I'm not sure.

3              THE COURT:  Does it have anything to do with

4    this.  This is something different, right?

5              MR. HOOD:  That's -- yeah, that's the

6    contract that we --

7              THE COURT:  Okay.

8              MR. HOOD:  -- that we signed.

9    BY MR. HOOD:

10        Q     Okay.  I have a few more questions.  One --

11   I'm sorry.  Give me a second.  I'm reading your deposition.

12        A     Uh-huh.

13        Q     So I may ask the same questions again.  Were

14   there any monies invested in Destiny, Inc., other than

15   those that you believe you were entitled to based on your

16   commissions?

17        A     Yeah.  The other fifty percent of the

18   purchase price of this property and the fifty percent of

19   the furnishings.

20        Q     Okay.  On your deposition, you said there

21   was just the cost of the furnishings.

22             MR. TAYLOR:  Hold on a second.

23   BY MR. HOOD:

24        A     No.

25             MR. TAYLOR:  Hold on a second.  He's telling

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 77 of 131

77

1       him what his deposition said.  That's not proper.

2                   MR. HOOD:  Okay.  I'm sorry.  I'm trying to

3       clarify that basically there was no other monies

4       given to me except for based on what those papers

5       say up there as far as commissions, that everything

6       came out of his commissions.  That's all I'd like

7       to --

8                   THE COURT:  All right.  Well, and the first

9       question.  If you're going to try to ask somebody

10      about a deposition -- what they said in a

11      deposition, you have to show them the deposition.

12                  MR. HOOD:  Oh, okay.

13                  THE COURT:  And say, is that what you said

14      or something.

15   BY MR. HOOD:

16          Q       If you'll look at line --

17          A       Yeah.

18          Q       Okay.

19          A       The one you've underlined.

20          Q       Yes.

21          A       Were there any other monies invested in

22   Destiny, Inc., other than those which you believe you're

23   entitled to?

24          Q       By commissions?

25          A       I invested no other monies in Destiny, Inc.,

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 78 of 131

78

1    but you did.

2            Q        Basically, it --

3            A        Fifty percent --

4            Q        -- was all invested --

5            A        -- of the property.

6            Q        -- by commission; is that correct?

7            A        Pardon me?

8            Q        That's all -- that was my only question.

9            A        Fifty percent of the property.

10           Q        Okay.

11           A        And fifty percent of the furnishings.

12           Q        Do you have a real estate license in the

13   State of Tennessee?

14           A        No.

15           Q        Okay.  Did you ever pay taxes on the monies

16   that you received for the commissions that you were paid

17   from in Tennessee --

18           A        In Tennessee?

19           Q        -- or from Incred-I-Builders?  Yes.

20           A        No.

21           Q        Okay.

22           A        I'm not vested in Tennessee.

23           Q        Okay.

24           A        And also, I don't need a real estate license

25   in Tennessee, because I was only -- I was selling

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 79 of 131

79

1  properties in the UK.  They were being sold in the UK to UK

2  residents.

3       Q     Okay.

4       A     You knew that anyway.

5             MR. HOOD:  No further questions.

6             MR. TAYLOR:  Is this going to be -- this

7       deposition going to be entered into -- as an

8       exhibit?

9             MR. HOOD:  I don't know.

10            MR. TAYLOR:  I'm not going to ask him about

11      it.

12            THE COURT:  You can do it if you want to.  I

13      mean, you want to introduce it?

14            MR. HOOD:  Okay.

15            MR. TAYLOR:  It may already be a court

16      record.  I don't know.

17            MR. HOOD:  I'm not sure either.

18  (Exhibit No. 8 was filed.)

19                    REDIRECT EXAMINATION

20  BY MR. TAYLOR:

21      Q     Okay.  Mr. Rooney, have you looked at the

22  numbers that Mr. Hood has provided for you regarding monies

23  he claims have been paid to Abbacas --

24      A     Yes.

25      Q     -- for the Summit View development project?

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 80 of 131

80

1        A        Yes.

2        Q        Do you agree with the figures that he has

3   calculated?

4        A        No.

5        Q        Are there some problems in the figures he --

6        A        Yes.  He's -- he's got construction loan

7   interest in them totaling a hundred and eighty-eight

8   thousand four hundred and twenty, which he's charging to

9   me.

10        Q        Okay.  Have you properly account -- after

11   looking at the numbers that he's provided both in the

12   notebook and the other document, have you -- do you feel

13   like you've properly accounted in your accounting for all

14   commissions paid and unpaid?

15        A        Yes, I do.

16        Q        Okay.

17        A        His figures on the list -- the book he just

18   gave us and --

19              THE COURT:  Does it have an exhibit number

20        it?

21              MR. TAYLOR:  The book, what's the book?

22              THE COURT REPORTER:  Exhibit 7.

23              MR. TAYLOR:  7.  It's Exhibit 7.

24   BY MR. TAYLOR:

25        A        Six of the amounts are correct with four of

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 81 of 131

81

1    the amounts -- commission amounts are wrong.  And the

2    difference on those is one is fifty-four thousand

3    dollars -- I'm rounding off, sir -- one is thirty-nine

4    thousand dollars, one is a thirty thousand dollars, and one

5    is seven thousand dollars.

6         Q    Okay.  Have you seen anything here today

7    that -- would you change any of your calculations?

8         A    No.

9              MR. HOOD:  I've got one more question with

10        regard to what you just asked.

11                        RECROSS-EXAMINATION

12   BY MR. HOOD:

13        Q    Mr. Rooney, did you agree to pay the

14   construction costs --

15        A    No.

16        Q    -- or interest?

17        A    No.

18        Q    Okay.  Do you recall Lot 6, Spinlove?

19        A    Smith.

20        Q    Simon and --

21        A    Yeah.  You've -- I seen your -- on the book,

22   you've got fifty-three thousand dollars being charged to

23   me.

24        Q    Do you recall why --

25        A    Which wipes out the commission which was

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 82 of 131

82

1    due.

2           Q       Do you recall why that lot didn't close?

3           A       No.

4           Q       Do you recall the ninety-five thousand

5    dollar deposit that you spent in England?

6           A       Any -- any monies which we've retained --

7           Q       Yes or no?

8           A       -- are already shown on my statement.

9           Q       Do you recall the ninety-five thousand

10   dollars that you spent --

11          A       No.

12          Q       -- of their -- of their deposit?

13          A       I didn't spend their deposit.

14          Q       Okay.

15          A       We withheld monies from you --

16          Q       Do you --

17          A       -- and with your agreement, and it showed in

18   your files.

19          Q       Can you tell me -- in that notebook is the

20   completion date of Lot 6.  It states when it was

21   completed.  Can you tell me why it did not close for four

22   or five months after?

23          A       I have no idea.

24          Q       You do not recall the fact that we could

25   not --

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 83 of 131

83

1        A       No.

2                MR. TAYLOR:  He's testifying.

3    BY MR. HOOD:

4        A       No.  I have no idea.  No idea.  You did the

5    closings, not us.  We introduced the sale to you.  You did

6    the closings.  If there's a delay in the closings, that's

7    between -- that's between you and the buyer.

8        Q       Is it not true that we were unable to close

9    Lot 6 because of the deposit that you --

10       A       I've already answered you.  No.

11       Q       Okay.

12               THE COURT:  Well, he answered the question.

13   He answered no, I guess.

14               MR. TAYLOR:  Are you finished?

15               MR. HOOD:  Yes, sir.

16                      REDIRECT EXAMINATION

17   BY MR. TAYLOR:

18       Q       Mr. Rooney, according to your calculations,

19   can you tell, for the record, the Court, how much money you

20   have calculated with all your figuring and all your

21   accounting, how much money is due to Abbacas from Mr. Hood,

22   Destiny, Inc., Destiny, LLC, or Lake Casa for the Summit

23   View property, how much money is -- remains to be paid?

24   Just Summit View.  Don't --

25       A       Summit View.

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 84 of 131

84

1       Q       Just for Summit View.

2       A       There's four different amounts.  Expenses

3    and legal fees, a hundred twenty-four thousand forty-six

4    dollars and fourteen cents.  Property taxes, which we can't

5    predict, is to be paid in the future, so that discounted

6    that.  Replacement of furniture, etc., forty-seven thousand

7    five hundred.  Rental income, one million seven hundred and

8    fifty-four thousand seven hundred and ninety-two dollars.

9    That's on the lake house.  Okay?

10      Q       Okay.  Do you have your calculations there

11   that you could look and tell me how much commission you

12   calculate is due to you?  Is that from Summit View -- what

13   you just gave me was for the lake house?

14      A       That's the lake house.

15      Q       I'm sorry.  Can you give me the same figures

16   for Summit View?

17      A       One million seven hundred and forty-seven

18   thousand seven hundred and twenty-five dollars.

19      Q       And how much is due to you for the lake

20   house?

21      A       There's three amounts.

22      Q       Okay.

23      A       One hundred and twenty-four thousand and

24   forty-six.  That's expenses and legal fees.  That covers

25   both the -- all aspects.  And replacing the furniture at

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 85 of 131

85

1    the lake house, forty-seven thousand five hundred.   Rental,

2    loss of rental income, one million seven hundred and

3    fifty-four thousand seven hundred and ninety-two.

4         Q       Okay.  So --

5                 THE COURT:  But it's one fifty-four

6         thousand --

7                 THE WITNESS:  The total amount --

8                 THE COURT:  Wait.  Wait.  A hundred and

9         fifty-four.  Was it fifty-four or one fifty-four?

10                 MR. TAYLOR:  I'm not sure your question.

11                 THE COURT:  Third figure he's testifying to.

12                 THE WITNESS:  One million seven hundred and

13        fifty-four thousand seven ninety-two.

14    BY MR. TAYLOR:

15         Q       Okay.  Do you have your calculations for

16    Summit View?

17         A       Yeah.

18         Q       Not Willard Way?

19         A       Yes.

20         Q       Okay.  And what are your calculations --

21         A       One million seven hundred and forty-seven

22    thousand seven twenty-five.

23         Q       And those are commissions and --

24         A       Commissions, etc.

25         Q       How much money have you paid the receiver so

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 86 of 131

86

1    far?

2          A       Eleven thousand dollars.

3          Q       Did you pay for the taxes?

4          A       Yeah.   Seventeen thousand two hundred plus.

5                  MR. TAYLOR:   Okay.   I think that's all, Your

6          Honor.

7                  THE COURT:   Do you know what exhibit you're

8          reading from?

9                  THE WITNESS:   That was B.

10                 THE COURT:   You have any other proof?

11                 MR. HOOD:   No, sir.

12                 THE COURT:   Do you want to argue it?

13                 MR. TAYLOR:   Excuse me?

14                 THE COURT:   I said, do you want to argue,

15         state your position, or tell me to go home.

16                 MR. TAYLOR:   I'm not -- I'm debating whether

17         or not to call Mr. Rooney or not -- Mr. David

18         Rooney.

19   BY MR. TAYLOR:

20         Q       Your son is David Rooney; is that correct?

21         A       Yes.

22         Q       Is he a real estate broker?

23         A       In the State of Florida, yes.

24         Q       How long has he been a real estate broker?

25         A       Since probably 1990 or thereabouts.

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 87 of 131

87

1    Q       And he has an active license now; is that

2  correct?

3    A       Yes.  I believe so, yeah.

4    Q       All right.  Can you identify these

5  documents, please?

6    A       This is the Florida Department of Business

7  Professional Regulation, and licensee name David Blake

8  Rooney.  And that's running from the 11th of July, 1994,

9  through the -- sorry -- I reversed the dates.  It's the 7th

10 of November, 1994, to the 30th of September, 2016, and this

11 is -- this is confirmation of the same thing.

12   Q       All right.  He just raised the issue, so --

13 and Mr. Rooney was your agent here in the United States; is

14 that correct?

15   A       Yes.

16           MR. TAYLOR:  I want to offer this as the

17       next exhibit.

18 (Exhibit No. 9 was filed.)

19 BY MR. TAYLOR:

20   A       But he didn't do any sales in Summit View.

21   Q       Right.

22           MR. TAYLOR:  Can we have just a few minutes

23       to confer, and I'll let you know if I'm done, Your

24       Honor.  Your Honor, I think I would like to ask

25       Mr. Hood some questions.

1                THE COURT:  Okay.  You've been sworn, right?

2                MR. HOOD:  Yes, sir.

3                THE COURT:  All right.  Have a seat right

4        here.

5                        ALLEN HOOD,

6        the next witness called on behalf of Abbacas,

7        having been first duly sworn, was examined and

8        testified as follows:

9                     DIRECT EXAMINATION

10   BY MR. TAYLOR:

11        Q      Please state your name for the record.

12        A      Allen Lee Hood.

13        Q      Okay.  What's your address?

14        A      431 Thomas Loop Road.

15        Q      Can you tell me -- tell me about the

16   formation of Lake Casa.  What is Lake Casa?

17        A      Lake Casa is an FLP.

18        Q      Organized in where?

19        A      South Dakota.

20        Q      Okay.  Take a look at that.  See if that

21   represents the Certificate of Limited Partnership for Lake

22   Casa.

23        A      Yes.

24        Q      And this says Thomas Loop Road.  Is that the

25   address you gave me?

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 89 of 131

89

1          A          That is correct.

2          Q          Okay.  I didn't understand what you said.

3     I'm sorry.

4          A          Oh, I'm sorry.

5                      MR. TAYLOR:  I'd like this to be the next

6             numbered exhibit.

7     (Exhibit No. 10 was filed.)

8     BY MR. TAYLOR:

9          Q          Tell me how Lake Casa came about owning the

10    full fee simple in the last house.

11         A          I transferred it.

12         Q          From?

13         A          The Destiny, LLC.

14         Q          Okay.  And how did Destiny, LLC, get a fee

15    simple -- full fee simple interest in the house?

16         A          I'm not sure of the question.

17         Q          How did -- how did the LLC acquire the full

18    interest in the house?

19         A          Changed it from Destiny, Inc.  So it went

20    from Destiny, Inc., to Destiny, LLC, to Lake Casa.

21    Destiny, Inc., was the original we set it up in.  David and

22    I and Mr. Yates talked about the tax ramifications of it

23    and decided to put it into the LLC.  They authorized me to

24    do it.

25         Q          Okay.  So Destiny, Inc., was owned by who?

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 90 of 131

90

1      A       It was owned by Abbacas and Allen Hood

2      Q       Abbacas.

3      A       Abbacas.  I'm sorry.

4      Q       Okay.  Abbacas and you, right?  Is that
5  correct?

6      A       That's correct.

7      Q       Okay.  And you issued a stock certificate to
8  Abbacas showing his one-half interest, so that made Abbacas
9  a one-half interest in the house, correct?

10     A       (The witness nods head.)

11     Q       So when you transferred the house to Destiny
12 of Tennessee, LLC, did you create a one-half membership
13 interest in Abbacas?

14     A       I'm not quite sure how it was done.  I don't
15 remember.  But I do know that it was done because David and
16 an attorney talked about it, because it was the best way to
17 do the taxes at that point.

18     Q       Do you know when that conversation took
19 place?

20     A       No, sir.

21     Q       Okay.  And so why did you transfer the lake
22 house, which was now wholly owned by an LLC in which the
23 Rooneys had no membership interest, why did you transfer it
24 to Lake Casa?

25     A       Because basically, Abbacas never fulfilled

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 91 of 131

91

1    it's obligations.

2        Q        Abbacas.

3        A        Abbacas never fulfilled its obligations on

4    their portion of the payment, so --

5        Q        That's your testimony, but is that a valid

6    way to divest a property?

7        A        I'm not saying I'm the smartest guy, but

8    that's what I did because I thought that that was what they

9    wanted to do.  At that point, we were not talking anymore.

10   They owed me so much money it was just ridiculous, so I

11   just said, fine.  We'll wash our hands of this.  I'll take

12   the house.

13       Q        But did you not transfer one-half interest

14   in the lake house back to Abbacas by deed from your

15   attorney?

16       A        You guys made me do that on -- well, let me

17   rephrase.

18       Q        I believe the Judge ordered you to do that.

19       A        Yeah, because it needed to go back until it

20   was figured out who had paid what.  Yes, that is correct.

21       Q        Okay.  All right.  Tell me about the

22   insurance on the house.

23       A        It still has insurance on the house.

24       Q        And who are the named insureds?

25       A        The house's named insured is probably Lake

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 92 of 131

92

1    Casa.

2         Q      And you don't have Abbacas as also a named

3    insured on that?

4         A      No, sir.

5         Q      Are you sure about that?

6         A      Oh, maybe I -- maybe -- I'm not sure.

7    Mr. Ross maybe asked me to do it.  I don't know.

8         Q      Who's handling that right now?

9         A      State Farm.

10        Q      I mean, isn't Mr. Ripley in charge of the

11   house and that?

12        A      Yes.

13        Q      Okay.  So you don't know who is the insured?

14        A      I'm still paying for insurance on it.

15        Q      But you don't know who the policy has a

16   named insured, do you?

17        A      For me, or for Mr. Ripley?

18        Q      There's one insurance policy on the house,

19   as far as I know.

20        A      There's two.  I'm still paying on it,

21   because I didn't know -- I never heard from Mr. Ross who

22   was paying the insurance, and I didn't want it to --

23   anything to happen to the house.

24        Q      Mr. Ross being Mr. Gray?  Is that who you're

25   talking about.

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 93 of 131

93

1          A          I'm sorry.  Mr. Gray.  Yeah.

2          Q          I just want to make sure that when I read

3     this I understand it.

4          A          Okay.

5          Q          Okay.  Well, I'm looking at a Certificate of

6     Liability Insurance here.  I want you to take a look at

7     it.  Lawn Reagan.

8          A          Okay.  At that time, you're correct.

9          Q          All right.  And that --

10         A          We switched.

11         Q          -- and that -- who's the named insured in

12    that?  If you'll read that, please.

13         A          Allen Hood and Justin Jones.

14         Q          And why is Justin Jones a named insured?

15         A          No idea why he's on there.

16                    MR. TAYLOR:  I'd like to offer this as the

17         next --

18    (Exhibit No. 11 was filed.)

19    BY MR. TAYLOR:

20         Q          Well, did you participate in the acquisition

21    of the insurance in the house?

22         A          Yes, I did.

23         Q          Okay.  But you can't tell me why --

24         A          There's no reason why.  I mean, I thought

25    the insurance followed the property address, so I didn't

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 94 of 131

94

```
 1    know -- I don't know how this happened.

 2              Q      Okay.  Well, let me show something else --

 3              A      But it's still --

 4              Q      -- and maybe it will jog your memory a

 5    little bit.

 6              A      Okay.

 7              Q      Let me show you this.  This is to you

 8    earlier.

 9              A      What year is this?

10              Q      2010.

11              MR. TAYLOR:  Next exhibit.

12    (Exhibit No. 12 was filed.)

13    BY MR. TAYLOR:

14              Q      Who's the named insured there?

15              A      Allen Hood.

16              Q      So if something happened between 2010 and

17    2012 that made Mr. Justin Jones one of the named insureds,

18    does he own an interest in the house?

19              A      Not at all.

20              Q      Have you encumbered a house with a loan or

21    anything, a mortgage?

22              A      No.

23              Q      Is it fully free for transfer, as far as you

24    know?

25              A      Besides the assessment from the HOA and the
```

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 95 of 131

95

1    taxes, yes.

2         Q        What's the situation with the HOA?

3         A        I was making payments until last year -- or

4    I'm not sure when I quit making payments.  I was making

5    payments of six hundred dollars a month.

6         Q        That was part of your agreement with them?

7         A        That is correct.

8         Q        And have you been in touch with the counsel

9    for the HOA?

10        A        She called -- Kimberly?

11        Q        Melinda?

12        A        No.  Kimberly.

13        Q        I don't know.  Melinda Meador is one of the

14   other lawyers.

15        A        Kimberly called me the other day and asked

16   me what was going on with the payment.  I said, We're still

17   in the lawsuit, and we're going to court next week.

18        Q        So the HOA hasn't taken any further action

19   as far as you know?

20        A        Not that I'm aware of.

21        Q        Because originally they were foreclosed on

22   the house for the --

23        A        Originally, they did, and that's when we

24   worked out the payment plan?

25        Q        And do you remember how much the arrearages

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 96 of 131

96

1    were?

2         A       No.

3         Q       Ballpark?

4         A       I don't know.

5         Q       Does fifty-three thousand dollars sound

6    familiar?

7         A       It's possible.

8         Q       Okay.

9         A       It's in that area.

10        Q       Okay.  So you had Destiny, Inc.  You owned

11   one-half of it.  Abbacas owned one-half of it.  You

12   converted to an LLC, correct?

13        A       That's correct.

14        Q       Did you have an operating agreement for that

15   LLC?

16        A       I'm not sure.

17        Q       Do you have any sort of membership interest

18   assigned in the LLC?

19        A       I'm not sure.

20        Q       But you transferred the house to the LLC; is

21   that correct?

22        A       That is -- I facilitated it, yes.

23        Q       Okay.  And then you formed Lake Casa Limited

24   Partnership, correct?

25        A       That is correct.

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 97 of 131

97

1        Q        In South Dakota.  And can you tell me why in

2   South Dakota?

3        A        It's an FLP.  That's what the attorney

4   recommended for any properties that I was holding.

5        Q        And are there any other partners in Lake

6   Casa?

7        A        No.

8        Q        Just you?

9        A        Yes, sir.

10       Q        So you transferred the property to Lake

11  Casa?

12       A        Yes.

13       Q        Basically, to you.

14       A        That is correct.

15       Q        Until the Judge ordered you to send half

16  back?

17       A        That's correct also.

18                MR. TAYLOR:  All right.  Let me just take a

19           second, Your Honor.  May I see the MLS listing, the

20           exhibit that was the MLS listings?

21                THE COURT:  Well -- okay.  You talking about

22           what we were talking about a little while ago?

23                MR. TAYLOR:  Yes.  Was that G?

24                THE COURT REPORTER:  G.

25                THE COURT:  It's here.  It's right here.  F.

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 98 of 131

98

1          MR. TAYLOR:  F.

2          THE COURT:  I did find one marked G though.

3      I've got two of them.  That's okay.

4  BY MR. TAYLOR:

5          Q      Okay.  Take a look at that Mr. Hood.

6          A      Okay.

7          Q      Do you know what that is?

8          A      It's a listing agreement or a listing -- a

9  listing.

10         Q      Is that what's called an MLS listing?

11         A      It appears to be, yes.

12         Q      Who was the owner in the house in that?

13         A      Kimberly Hazel.

14         Q      Okay.  Let me help you here.

15         A      Okay.

16         Q      Owner name, who does that say?

17         A      Hood.

18         Q      Hood.  Okay.  And do you know when this was

19  listed for sale?

20         A      It says it was listed on --

21         Q      Do you not remember listing it for sale?

22         A      No.  This is years ago.  2014 maybe.  No.

23         Q      Is this a separate listing.  There's more

24  than one listing, isn't it?  It's a separate listing.

25         A      Okay.  I remember this.

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 99 of 131

99

1      Q      All right.  Go ahead.

2      A      What would you like to know?

3      Q      Tell me the circumstances when you listed it

4    for sale.

5      A      We had talked about selling it.  I bought

6    them an offer.

7      Q      We, we, we, we.  Who is we?

8      A      Arthur and I.

9      Q      And when did you talk to Arthur about that?

10     A      I'm not sure.

11     Q      Okay.

12     A      I brought them an offer.  It was through

13   them.  I had to sign a listing to make it a valid deal.  I

14   had an offer for, I think, a million, and they said no.

15   Because I wanted to settle our debts and be done.

16     Q      Isn't the owner at the time of this

17   listing -- was it both in your name and Abbacas, or was it

18   just in your name?

19     A      The listing agreement says Hood, but I'm not

20   sure at that -- I mean, it doesn't even have a date, so how

21   would I know?

22     Q      Well, when did a judge ask you -- make you

23   transfer your one-half interest back to Abbacas?

24     A      Do you have the record?  I think it was a

25   couple of months ago.  Oh, it may have been -- I don't

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 100 of 131

100

1   know.  The last time I was in court.

2        Q     Last year -- last year perhaps?

3        A     Possibly.

4        Q     Okay.  So you transferred a piece of

5   property that was owned one-half interest in you and

6   one-half interest in Abbacas and you -- I mean, you tried

7   to sell it as the owner?

8        A     Yes.

9        Q     Okay.  I don't understand.  If you're -- if

10  you've got a rental property that you're renting and you're

11  generating income and have a one-half ownership interest in

12  Abbacas, why are you trying to sell it?

13       A     Because we were trying to settle our debts.

14       Q     Accord to you, you say --

15       A     According to me.

16       Q     -- you had a conversation with Mr. Rooney?

17       A     That's correct.

18       Q     And how many times did you list this house

19  for sale?

20       A     I'm not sure.

21       Q     You don't have any idea?

22       A     Well, it appears twice.

23       Q     At least twice?

24       A     Well, once was because, to make an offer, we

25  had to list it with them.  The other one was a company that

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 101 of 131

101

1   I owned, and we were going to try to sell it and then let

2   the proceeds -- here was -- the bottom line for selling it

3   was, the proceeds -- they wouldn't be able to close it

4   because there was an affidavit on it.  Okay?  So to --

5        Q      There's an affidavit.  What do you mean by

6   an affidavit?

7        A      I believe that Mr. Rooney filed an affidavit

8   saying that he was -- and that it couldn't be sold, blah,

9   blah, blah, without his permission.  So the --

10       Q      And was there not a lien lis pendens to this

11  lawsuit on behalf of Abbacas filed against the house as

12  well?

13       A      That is correct.

14       Q      All right.

15       A      So the money would have gone into an

16  account, and then we could have fought over the money, and

17  I could stop taking care of the property.  That was the

18  reason why I was trying to sell it.  And then we could

19  fight over it, whatever, but I was tired of taking care of

20  the property.

21       Q      And who is Tyler Hitt?  Is it Hit (phonetic)

22  or Hite (phonetic)?

23       A      Tyler Hitt was a gentleman that I helped

24  out, and he later on -- just like I helped David and let

25  him live in my house for a year.

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 102 of 131

102

1      Q      And you didn't charge Tyler money to live in

2  your house?

3      A      I did.

4      Q      How much did you charge him?

5      A      I believe it was stated earlier.  I'm not --

6  I don't recall.

7      Q      Was it nine thousand dollars?

8      A      Possibly.

9      Q      Did you give one-half of that to the

10  Rooneys?

11      A      No.

12      Q      Wasn't the house one-half theirs?

13      A      It's one-half theirs when they pay for it,

14  is the way I look at it.  And I might be wrong, but that's

15  the way I look at it.  They never paid their portion, so

16  they're not entitled.  They didn't help me take care of it

17  for years.  They didn't help me do all the stuff that

18  needed to be done every year to this day.  They walked away

19  from the property, so I did what --

20      Q      According to you?

21      A      According to me, it's -- I mean --

22      Q      According to Mr. Ripley, did he not state

23  that there was a lot of things needed to be done to the

24  house?

25      A      Currently.  The house -- we've had the house

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 103 of 131

103

1    for ten years.

2        Q        Did you have an agreement with Mr. Hitt to

3    sell the house to him?

4        A        I don't think so.  I'm not -- I mean, I

5    don't know why I would sell it to him.  I mean, I couldn't

6    sell it.

7        Q        Well, you didn't have an owner-financing

8    agreement with Mr. Hitt?

9        A        No.

10       Q        Okay.  All right.

11       A        No.  Because I can't sell it.  There's no

12   way for me to sell it.

13       Q        I believe the special master [sic] filed

14   some statements on the house.

15       A        Okay.

16       Q        Did you see those?

17       A        I don't recall.

18                MR. TAYLOR:  Can we just show --

19                THE COURT:  The receiver filed.

20                MR. TAYLOR:  Yeah.  He's got some tax

21        statements.  Was that --

22                THE COURT:  The special master didn't file

23        them.  The receiver did.

24                MR. TAYLOR:  I'm sorry.  The receiver.

25        Mr. Ripley.

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 104 of 131

104

1          THE COURT:  I didn't remember doing

2     anything.

3          MR. TAYLOR:  My fault.

4          THE COURT:  Well --

5          MR. TAYLOR:  Can we see that?  I'd like to

6     show it to him.

7          THE COURT:  And are they part of this?

8          MR. TAYLOR:  I believe it's No. 1, isn't it?

9          THE COURT REPORTER:  It was either 1, 2, 3,

10     or 4.

11          MR. TAYLOR:  It's one of the first ones.

12          THE COURT:  All right.

13          MR. TAYLOR:  I think it's got a letter to

14     Ross Gray in the front or from Ross Gray in the

15     front.

16          THE COURT:  Well, this is one from Ross

17     Gray.  You all talked about that for a while.

18  BY MR. TAYLOR:

19     Q     Okay.  Mr. Hood, this is Exhibit 1.

20  Mr. Ripley offered that letter from Ross Gray to you.  Do

21  you remember this letter?

22     A     Okay.

23     Q     Do you remember the letter?

24     A     Yes.

25     Q     Okay.  Can you look at these tax worksheets

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 105 of 131

105

1    that are attached to the letter?

2         A      Okay.

3         Q      Do you recall that?

4         A      Do I recall --

5         Q      These tax returns?

6         A      No.

7         Q      Can you show me how much income you made off

8    the house?

9         A      No.  It's not possible, because you don't

10   have the expenses.

11        Q      You can show me the gross, can't you?

12        A      But the gross is irrelevant unless you add

13   up all the fees of what I paid every month.

14        Q      Did you provide any of this to the Rooneys?

15        A      No.

16        Q      Who prepared these taxes for you, Mr. Hood?

17        A      Probably my accountant, Jim Stiles.

18        Q      And you didn't discuss these at all?  Did

19   you sign them without discussing it?

20        A      I don't recall.

21        Q      Okay.  Schedule E, Income, line 3, what is

22   that?

23        A      Line 3 says eighty-three thousand dollars.

24        Q      Okay.  Is it your testimony that maintenance

25   on the house cost eighty-three dollars during that tax

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 106 of 131

106

1    period?

2         A       No, sir.

3         Q       Then did you split -- what did you do with

4    the rental income?  Did you give one-half to the Rooneys?

5         A       No, I did not.

6         Q       What did you do with it?

7         A       I'm not sure.  I probably fixed it, and we

8    had three incidences.  One was almost sixteen thousand

9    dollars of damage that I paid.  The other was three or four

10   thousand.  And I have police reports on all that when they

11   broke in.

12        Bottom line is, is eighty-three thousand dollars is

13   a number, but you've got to minus twenty-three thousand

14   dollars for commissions.  You've got, you know, utilities.

15   I mean, there's -- there's -- you're making it sound like I

16   pocketed eighty-three thousand dollars.

17        Q       No.  I'm just asking you -- first of all, I

18   asked you if you thought that the cost would exceed

19   eighty-three thousand dollars, and I believe you said no.

20   There was some income generated by this house, was there

21   not?

22        A       Yes, there was.

23        Q       Okay.  And you kept it, didn't you?

24        A       Yes.  Or I used it on the house, but anyway.

25                MR. TAYLOR:  All right.  Your Honor, I think

1    we rest.  Notice I said I think.  I'm just kidding.

2           THE COURT:  You can come down.

3           MR. HOOD:  All right.  Thank you.

4           THE COURT:  Unless you want to testify on

5    your own.

6           MR. HOOD:  How does that work?  So I can

7    testify?

8           THE COURT:  You can testify or not, but what

9    I'm talking about he's rested his case.  So you now

10    have a right to put on your case if you want to,

11    which consists probably of you testifying.  You can

12    say anything you want short of certain limitations.

13           MR. HOOD:  So I can basically tell my story?

14           THE COURT:  Sure.  If you want to.

15           MR. HOOD:  Within reason?

16            TESTIMONY FROM MR. HOOD

17           MR. HOOD:  I believe that the -- I believe

18    you have the facts.  The facts are on the page in

19    regards to the contract that we last signed.  The

20    facts are on the documents that -- of funds improve

21    and funds distributed.

22           The bottom line is, is the house was

23    never -- Abbacas -- I'm sorry --  their company

24    never ever finalized and paid their portion of the

25    lake house.  That is the reason why I took the

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 108 of 131

108

1    actions that I did.

2        In the past, Arthur, David, and I have had

3    many meetings where Arthur had screwed up the books

4    so bad, that we just said, Forget it.  Forty

5    thousand and sixty thousand just went bye-bye.

6    We've flown over to England on numerous occasions to

7    fix Arthur's messes that he created.

8        They also -- they also helped me sell a lot

9    of properties, and I'm thankful for that.  But at

10   the end of the day, they didn't fulfill their

11   obligations on the lake house, so I feel in no way

12   that they are entitled to that lake house.  I feel

13   that they are in no way entitled to any compensation

14   more than what is spelled out in receipts, copies of

15   certified funds being delivered or wired, checks.  I

16   believe all the proof is right there.  So that's all

17   I need to say.

18       MR. TAYLOR:  If he's testifying, I can

19   cross, correct?

20       THE COURT:  Sure.

21              CROSS-EXAMINATION

22   BY MR. TAYLOR:

23       Q    Wasn't your agreement that you were going to

24   retain a portion of the commissions?

25       A    Reference of which agreement, sir?

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 109 of 131

109

1     Q       Payment on the lake house.

2     A       The last one that was signed, is that the

3  one you're referring to?

4     Q       The last one what?

5     A       The last document that we signed stating how

6  much they owned.

7     Q       I'm talking about your agreement and the

8  price list.

9     A       It's all irrelevant, because that document

10 was done afterwards, and it said there was only fourteen

11 properties left.  Everything else before that does not

12 matter.

13    Q       I don't understand what you say, that

14 document.  I guess I'm --

15    A       I'm sorry.  I'm not sure what exhibit it

16 is.  It's got the red letters or -- red lines on it.

17            THE COURT:  Well, I ought to be able to find

18        that.  Are you all sure you --

19            MR. TAYLOR:  It's in there.

20            MR. HOOD:  Yeah.  It's the one I explained

21        to you how the -- if you pull them apart, they read

22        together across the deal.

23            THE COURT:  That's right.  You did say that.

24            MR. HOOD:  Yes, sir.

25            THE COURT:  So it's probably up here near

Case 3:18-ap-03008-SHB  Doc 26-17  Filed 10/15/19  Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master  Page 110 of 131

110

1    the -- well, I don't know.  I know what he's talking

2    about.  He's talk about a single -- I don't know

3    where things go to.

4         MR. TAYLOR:  You'd think it would stand out,

5    wouldn't you?

6         THE COURT:  Yeah.

7         MR. HOOD:  There was five or six pages.

8         THE COURT:  I was trying to think of what

9    exhibit it was.

10        THE COURT REPORTER:  It was either 5 or 6.

11        THE COURT:  Okay.  Well, let's see.

12        MR. TAYLOR:  That's a part of B -- no.

13   That's a part of A.  This goes with A.  That came

14   out of A.  And then -- well, and then all these --

15   oh, I see.  You're looking at the -- he's looking at

16   B, 1 through 30.  You're talking about Exhibit 5 or

17   6.

18        THE COURT REPORTER:  Right.

19        MR. TAYLOR:  It's none of these --

20        THE COURT REPORTER:  It's when Mr. Hood

21   started marking.

22        MR. HOOD:  It's probably right below that

23   notebook page possibly.

24        MR. TAYLOR:  Yeah.  It's not -- this is all

25   a part of B.

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 111 of 131

111

1          THE COURT:  Okay.  It's not in there either,

2     but --

3          THE COURT REPORTER:  It should be around the

4     notebook.  It was before the notebook.

5          THE COURT:  I think it was too, I mean,

6     because he came in here and talked about it twenty

7     minutes ago.

8  BY MR. TAYLOR:

9          Q      Well, I'd like to look at it.  Tell me what

10    you say that this is.

11         A      The document -- we signed a document in the

12    beginning that stated what we were -- how we were going to

13    do everything, how we were going to sell the properties,

14    the amounts and so forth.

15         Q      That's the agreement?

16         A      That is the original agreement.  That is

17    correct.

18         Q      That you followed up with a letter and a

19    price sheet, right?

20         A      That is possibly correct.  I'm not sure.

21    But that was the original agreement.  As time went on,

22    everything got screwed up.  The deposits, the transfers,

23    they kept saying that they already sent the money.  We

24    would show them where they hadn't.

25         So when -- when all that happened, everything was

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 112 of 131

112

1    screwed up.  We sat down one night at the lake house the

2    three of us and we went through everything.  We spent four

3    hours.  David was upset with Arthur because of everything

4    that had happened and the way it was going, so we wrote a

5    new sheet, a new contract, and we all three signed it that

6    night stating how much --

7           Q      You're talking about that piece of paper?

8           A      Yeah.

9           Q      And you said that's a new agreement or an

10   amendment to the old agreement?

11          A      That was the --

12          Q      I remember it.  I would like to look at it.

13          A      What we did that night is, we clarified,

14   from here on out, we've got fourteen properties left.  What

15   are we going to do with the fourteen properties?  How is

16   the remainder of the lake house going to be paid?  That was

17   our agreement.

18          Q      How many lots total were there?

19          A      I'm not sure.  Thirty-two, thirty-three,

20   somewhere around there.

21          Q      Okay.  So you sold how many before this

22   agreement you say is a restatement of a contract?

23          A      Nineteen.

24          Q      Okay.  And what happened to the commissions

25   on those?

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 113 of 131

113

1        A        They were all paid.  That's why we wrote

2    this agreement up is to show, from here on out, this is how

3    much is owed.  This is how we're going to do it, and this

4    is how the lake house is going to paid.

5        Q        So you credited the Rooneys for their

6    one-half interest in their commission payments --

7        A        No.

8        Q        -- toward the house?  Is that not your

9    agreement?

10       A        The agreement was on the houses they

11   closed.  They closed nine of those house -- it's all

12   spelled out.  All that -- but here's the deal.  There's

13   fourteen houses left.  Nine of those houses, they actually

14   facilitated the closing.  I have documentation on checks,

15   wired funds, credits, everything that -- the way we did it.

16       Q        Well, you say that, but you don't have that

17   here.

18       A        It's right here, and it's that -- you just

19   looked at it.  It was in that binder.

20       Q        Unsigned deal sheets.  Are there cancelled

21   checks in there?  I didn't see them.

22       A        Yes, there are.

23       Q        I did not see any cancelled checks.

24       A        There's cancelled checks.  There's wire --

25       Q        Well, let me look at that.

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 114 of 131

114

1          MR. TAYLOR:  Can we not find Exhibit 5?

2          MR. HOOD:  And Exhibit 6 actually.

3          THE COURT:  Well, I don't have this pink

4     stuff.  Are you sure you didn't put it back on your

5     desk?

6          MR. HOOD:  Can I look?

7          THE COURT:  Yeah, sure.

8          MR. HOOD:  Thanks.  No.

9          THE COURT:  Okay.

10   BY MR. TAYLOR:

11        A      These right here, this is a wire transfer,

12   debit.  It shows twenty-five thousand dollars.

13        Q      And what's this transfer to

14   Incred-I-Builders?

15        A      That was for deposits, which is all spelled

16   out.  There's a check.  There is -- it shows the amount

17   that was for the furnishings.

18        Q      The six thousand dollars?

19        A      They kept the six thousand dollars.  They

20   sent me over seventeen thousand.  They kept the six

21   thousand.

22        Q      Don't you agree that they were supposed to

23   get six thousand dollars --

24        A      You betcha.

25        Q      -- from a furniture pack?

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 115 of 131

115

1        A        You betcha.  It's all in here.  It's all in

2    there.   It even has the settlement statements, what exactly

3    I received, the original contracts, everything is in there.

4        Q        There's a lot of stuff without initials and

5    without signatures in here.

6        A        This is their contracts that they sent me

7    from their -- their buyers.  There's a HUD statements from

8    a viable title company.

9        Q        So does this represent the first one ones

10   you sold or the --

11       A        No.

12       Q        -- or the fourteen that were left?

13       A        It represents --

14       Q        Nine of the fourteen?

15       A        -- nine -- no it represents all fourteen.  I

16   gave all the information of what I sold the other ones for.

17   This is when the recession hit, so they were unable to sell

18   to the last people, bottom line because the mortgages went

19   from twenty percent down to forty percent down.  So then

20   what I did -- and it's all in here -- I sold the last

21   properties at my cost, what I owed the bank.  I was just

22   trying to break even at that point, trying to not have any

23   foreclosures.  I ended up foreclosing on two of them,

24   because I couldn't pay the interest anymore.

25       Q        What are the interest charges that you

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 116 of 131

116

1    attribute to Abbacas?

2         A        On which one?  It was -- it was all in

3    the -- basically, any deal -- any interest that's in there

4    was because we had talked about it and said, okay, on this

5    deal, we'll do this.  On this deal, we'll do this.  Because

6    we couldn't close it because they held the deposits.  I

7    couldn't give the banker here the deposit money to close it

8    because I didn't have it.

9         Q        Well, you say you changed your agreement,

10   but you said there's not anything written that says you're

11   going to do that, is there?

12        A        There's not anything written that says I'm

13   going to do what?

14        Q        You didn't change your -- you didn't

15   really -- you didn't change your contract where they agreed

16   to shoulder the interest --

17        A        Most certainly -- we -- well, yeah.  It's

18   right there in the document.  Say that again.

19        Q        You didn't amend your contract so that --

20        A        The first one?

21        Q        Yes.

22        A        Okay.

23        Q        So that you can attribute fifty-five

24   thousand dollars in interest on one property?

25        A        It held it for two-and-a-half years.  That

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 117 of 131

117

1    was just the interest payments I was paying on the house.

2         Q        So you -- and let me ask you another thing.

3         A        Okay.

4         Q        Where are all these other documents you're

5    talking -- you're talking about interest payments for two

6    years.  Where are the statements that say that?

7         A        Okay.  This is -- let's just go to one of

8    them, which is the one I asked him about earlier.  Smith,

9    Smith and Spinlove.  Okay?  This is the deal sheet.  Let's

10   say it's --

11        Q        Unsigned.

12        A        -- let's say it's completely wrong.  Okay?

13   But let's go to this right here.  Basically, this is an

14   email from the Smiths stating they want to know why they

15   can't close their house.  This is the actual -- here are

16   the charges I sent them.  I told them that that's what they

17   owed.  This is when they closed.  This is the agreement and

18   the completion.  Notice the completion.  This is when the

19   house was finished.  The house was finished in 8/10/2007.

20   We didn't close on this house until February 23rd 2009.

21        Q        How much interest did you charge to --

22        A        Fifty-three thousand is what I paid.  It was

23   twenty-five hundred dollars a month or whatever.

24        Q        Do you have that document?

25        A        Okay.  If the house is complete, and I owe

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
        Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 118 of 131

                                                                    118

1   three -- wait.  Hold on.  Let's go back to their original

2   agreement.

3           Q       Answer my question.  Do you have that

4   document?

5           A       In so much, yes.

6           Q       Show me.

7           A       The contract that says how much we were

8   going to build the house for.  Let's just say there was a

9   number of two hundred thousand.  It's in the -- it's in the

10  contract, the original agreement, right?  So you can do the

11  math on five percent, six percent.

12          Q       I don't want to do the math.  I want you to

13  prove to me in writing that you can validly charge them

14  a --

15          A       Well, how is --

16          Q       -- fifty-five thousand dollars in interest.

17  I don't see how you can do that.

18          A       Okay.  Well, how is a house completed in

19  2007 and sat there.  Who paid for the interest?

20          Q       That's not their concern.  They did what

21  they're supposed to do.

22          A       They did not.  The reason why I could not

23  close this is the ninety-five thousand dollars.  He spent

24  the money.  I couldn't -- I couldn't close it with the

25  banker because we didn't have the deposit.

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 119 of 131

119

1      Q      You know, can you show me that?  Can you

2  show me the ninety-five thousand dollars?  Can you show

3  me -- you're telling a story, but you're not showing me

4  anything.

5      A      Okay.  All right.  Actually, it's here.

6      Q      All right.

7      A      There is proof in here that says when they

8  gave Arthur the money.  Let me figure out this.  This is on

9  October 31st, 2008.

10      Q      What is it?

11      A      This is an email from -- or to Arthur from

12  Smith, from the purchasers of Lot 6.

13      Q      All right.

14      A      They contacted me.  We still have not

15  received the official closing documentation or even advice

16  that the construction has been completed.  Arthur was the

17  one that was -- I never spoke to the people.  I --

18  basically, I would -- the only time I spoke to them was

19  when they were mad,  and it was most of them?

20      Q      Did Arthur close the deals?

21      A      Did Arthur --

22      Q      Did he do the closings and close the

23  properties?

24      A      No.  Smoky Mountain Title did.

25      Q      Okay.  Now, who was -- were you the seller?

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 120 of 131

120

1          A        No -- yes.

2          Q        Yes.  Okay.  So that's your responsibility,

3     is it not?

4          A        It's my responsibility when he deals with

5     all the people and does the real estate transaction and is

6     paid a commission of a hundred thousand dollars a house.

7          Q        Wasn't his responsibility just to provide

8     you with leads to sell these properties?

9          A        That is incorrect.  His responsibility was

10    to facilitate everything.  I'm the building.

11         Q        Okay.

12         A        So I'm --

13                   THE COURT:  Do you all still want to look at

14         this?

15                   MR. TAYLOR:  Yeah.

16                   MR. HOOD:  Yeah.  Thank you.  And also the

17         other page that was with it.  There was the

18         contract.

19                   THE COURT:  There's a what?

20                   MR. HOOD:  Whatever number that is, the one

21         previous or the one after.

22                   THE COURT:  This is 6.

23                   MR. HOOD:  Okay.  Then it would probably be

24         5.  And that's the actual contract.  I have another

25         copy of it.

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 121 of 131

121

1          THE COURT:  Here it is right here.

2          MR. HOOD:  Yes, sir.

3          THE COURT:  Do you want it?  Just hold it

4     right there until he gets through bringing the other

5     part.

6          MR. HOOD:  Okay.

7          THE COURT:  We don't want to lose it again.

8  BY MR. TAYLOR:

9          Q     Is this the new contract that you were

10  talking about?

11         A     That is not a contract.  That is a

12  spreadsheet that states what that contract says.

13         Q     May I see that contract?  Okay.  So you're

14  saying what this contract says is it amends your agreement,

15  a written contract that you had with Abbacas, correct?

16         A     This is why we wrote it up that night.  We

17  wrote it up to square off.  I gave them a -- I gave them

18  sixty thousand dollars.  I'll never forget it, because I

19  was so mad.  I gave them sixty thousand dollar credit, and

20  I said, I don't care.  I'm done.  Let's just figure out

21  what we owe from here and be done.  And that's the reason

22  why we wrote that contract there.

23         Q     You heard Mr. Rooney testify he didn't

24  remember that, right?

25         A     That's not -- there's a contract.

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 122 of 131

122

1    Q    Did you hear Mr. Rooney testify?

2    A    Yes, I did.

3    Q    Thank you.  Can you tell me where the

4    original is?

5    A    No, sir.

6    Q    Was JT Capital Investments involved in any

7    of these projects?

8    A    I'm not sure.

9    Q    Are you involved in JT Capital Investments?

10    A    (The witness shakes head.)

11    Q    Do you know Mr. Jones, Mr. Justin Jones?

12    Are you a partner with Mr. Jones in any --

13    A    I don't -- I'm not sure.  In regards to what

14    aspect?  What was JT Capital, whatever you said?

15    Q    I'm just asking you if you were involved in

16    that in any way whatsoever?

17    A    I'm not sure.

18    Q    Was Mr. Jones involved in any of these

19    transactions?

20    A    In any of these transactions as --

21    Q    At issue here today.

22    A    He was involved with the rental company that

23    they also took from me and didn't pay me the forty thousand

24    dollars, if that's what you're asking.  I'm not sure.

25    Summit View, is that what we're talking about?

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 123 of 131

123

1       Q       I'm trying to figure out how come Mr. Jones'
2   name is listed as a named insured, which is someone who has
3   a --
4       A       Yeah.  I don't know.
5       Q       -- has an ownership interest in the
6   property?
7       A       Honestly, I think that was a clerical error
8   by Bond, because we were doing a lot of business with him
9   on other deals probably.
10      Q       We being you and Mr. Jones?
11      A       Me and Mr. Jones were doing other deals.
12  Yeah.
13      Q       And what kind of business were you
14  conducting?
15      A       I'm not sure at that time.
16      Q       What kind of business did you conduct with
17  him --
18      A       What kind --
19      Q       -- in general.  Maybe not at that time, but
20  tell me what business you --
21      A       Well, he helped set up the rental company.
22  I don't understand what's the question.  We bought a house
23  together, but he's not involved in any of this.  That was a
24  clerical error.  I don't know how it got on there.  There
25  has never been a lien on the -- I've never received any

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 124 of 131

124

1   money for the lake house, never received anything from

2   Justin towards the lake house.

3           Oh, I know -- I know now.  The reason why, he was

4   going to put a lien on the lake house because he did -- and

5   I don't have it with me, but he did fourteen thousand

6   dollars worth of Internet marketing for Timber Tops -- and

7   they have all the records on that -- and he told me that if

8   I don't get my money, that -- and I said, it's not my

9   fault.  We got into it a little bit because he was -- he

10  did accidentally do some work on the property.

11          Q       Accidentally did some work on the property?

12          A       Yeah.  He -- basically, there's a Google

13  Clicks or something like that, and he clicked the wrong

14  button so he spent more than what he was supposed to, and

15  then was only charging me like, I think, eight hundred

16  dollars a month for Internet marketing for the -- on top of

17  what Timber Tops was paying.  I think Timber Tops was

18  paying four hundred dollars a month, and I was paying an

19  additional eight hundred.

20          Q       So he was doing work for Timber Tops?

21          A       Yes.  But also, because I knew him, I said,

22  hey, I need you to help me make sure this thing rents.  So

23  I paid him an additional eight hundred, and accidentally,

24  he -- whenever he was doing something and Google -- and I'm

25  not sure how all this goes, but he did something and

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 125 of 131

125

1    accidentally spent more money than what he should have, and

2    said, hey, you know, I need to get paid for that one day.

3    And I said okay.  But once again, the insurance, I think

4    that was a clerical error.

5          Q        Well, it's an interesting coincident, isn't

6    it?

7          A        But what -- what base -- I mean, what is

8    it -- what does it have to do with anything?  If he wasn't

9    a part of it, he wasn't on it, it's an accident.

10          Q        Because if your attorney, Ross Gray, and

11    Judge Blackwood all agree that you should transfer it back

12    to Abbacas, their one-half interest in the property --

13          A        Okay.

14          Q        -- they should have been named as the named

15    insured as a one-half interest owner in the property.

16    They're not named.  You and Justin James are named.  That's

17    why it's important, because I'm trying to figure out why.

18          A        There's no other document that has his name

19    on it.  It was just clerical -- Bond probably wrote the

20    wrong thing on there.  I mean, honestly, this is --

21                MR. TAYLOR:  I'm through.

22                THE COURT:  Is that all?  You got anything

23          else to say?

24                MR. HOOD:  No, sir.  I'm done.

25                THE COURT:  All right.  You can sit down.

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 126 of 131

126

1          MR. HOOD:  All right.

2          THE COURT:  Do you want to argue?

3          MR. TAYLOR:  Well, I can just summarize,

4    Your Honor.

5          THE COURT:  Okay.

6          MR. TAYLOR:  I think the documents speak for

7    themselves.  Obviously, these parties had an

8    agreement, and we've got two sets of documents that

9    counteract each other.  We've got Mr. Rooney's

10   complete documentation of all the transactions,

11   which also include numbers that Mr. Hood has in his

12   transaction accounting.  Mr. Hood has a partial

13   transaction.

14        I think it's clear that Abbacas, Rooney

15   provided the contacts and facilitated the sales as

16   promised in their agreement, and they're due their

17   one-half commission as -- of their commission, plus

18   they're -- from which he should have taken out their

19   money for their half interest in the house, in the

20   lake house.  They're due their commission on the

21   remaining commissions.  They're due their six

22   thousand dollar furniture pack commissions.  They're

23   due all the monies that are outlined in Mr. Rooney's

24   spreadsheet.  So I think it's clear that there was

25   an agreement, because one-half of the agreement was

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 127 of 131

127

1    in London and the other half was not in Sevier

2    County.  I think the London account -- party got a

3    little bit of the short end.

4              As far as the lake house is concerned, I

5    mean, it's clear there.  They formed a corporation.

6    Mr. Rooney went back to England, and then Mr. Hood

7    converted to an LLC, did not transfer their

8    ownership interest, and then sold the -- or

9    transferred the property to Lake Casa.  Basically,

10   he took the one-half interest in the lake house that

11   both Mr. Gray -- Mr. Gray admitted, and Judge

12   Blackwood ordered him to return.

13             So, I mean, I think it's just clear, Your

14   Honor.  I think that in the absence of the Rooneys,

15   Mr. Hood has played fast and loose with the money.

16   I think that he breached their agreement, and I

17   think it's clear that Mr. Rooney has accounted for

18   the funds that are due him.  I think that the Court

19   ought to order the defendant -- and I am not sure

20   about Destiny, Inc.  I believe it's defunct.

21   Destiny, LLC, is defunct.  But Lake Casa and Allen

22   Hood are the -- that's who's left standing, and I

23   think the Court ought to order them to pay the three

24   point whatever million dollars that's due per their

25   agreement as we've demonstrated here today, Your

128

1    Honor.

2          THE COURT:  Do you think all the stuff that

3    your client's owed is on that one spreadsheet.

4          MR. TAYLOR:  Do I think what now?

5          THE COURT:  Do you think the amount of money

6    you're asking for and judgement against Destiny or

7    Hood?

8          MR. TAYLOR:  Hood and Lake Casa.  I'm not

9    sure what Lake Casa --

10         THE COURT:  All right.  I know -- all

11   right.  So those are the two people you're talking

12   about.  But I'm just saying, are you asking for --

13   is the amount of money you're talking about on that

14   spreadsheet you're talking about?

15         MR. TAYLOR:  There's two spreadsheets.

16   There's the amount due from the lake house, and

17   there's the amount due from the Summit View, which

18   he's accounted for every one of those lots.

19         THE COURT:  Okay.

20         MR. TAYLOR:  We provided not only that, the

21   deal sheets.  We've provided the warranty deeds

22   where they were transferred.  It's clear on the

23   warranty deeds, it says person responsible for

24   property taxes and it says UK.  I mean, everything

25   validates what Mr. Rooney has said here today, Your

Case 3:18-ap-03008-SHB    Doc 26-17    Filed 10/15/19    Entered 10/15/19 21:44:03    Desc Exhibit 16 Transcript of Proceedings before Special Master    Page 129 of 131

129

1      Honor.

2           THE COURT:  I was going to tell you,

3      Mr. Hood.

4           MR. HOOD:  Yes, sir.

5           THE COURT:  One of the problems you have

6      when you come to court is you don't have documents

7      on a lot of what you're talking about.  Now, I

8      understand I, in this case, denied this motion in

9      limine.  Okay?  But I certainly am not going to

10     allow you to rely on documents that you don't have

11     with you or which you have furnished to him.  So I

12     just thought I'd tell you that, but you got anything

13     to say?

14          MR. HOOD:  I'd just like to say basically,

15     the documents -- I agree there was an agreement.

16     There was an agreement between us.  It failed.  We

17     wrote a new agreement I have documentation in there

18     that states where the monies were given to, proof of

19     the funds being transferred, proof of the checks on

20     all the commissions that were due to them for the

21     last fourteen houses.  The facts are in there, and

22     that's all I have to say.

23          THE COURT:  Okay.

24          MR. TAYLOR:  Your Honor, would you like to

25     have the transcript before you work on your report?

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 130 of 131

130

1          THE COURT:  Are you all going to prepare a

2    transcript?

3          MR. TAYLOR:  Yes.

4          THE COURT:  Okay.  If you do it, then I'd

5    probably like to see it, because sometimes it's

6    easier to check against.  I probably don't need it,

7    but, I mean, I'd probably like to see if you're

8    going to do it anyway.

9          MR. TAYLOR:  Okay.  We'll talk to the court

10    reporter afterwards.

11          THE COURT:  All right.  That's all folks.

12          MR. HOOD:  Thank you, sir.

13          MR. TAYLOR:  Thank you.

14          THE COURT:  Thank you.  Have a good day.

15                END OF PROCEEDINGS

16

17

18

19

20

21

22

23

24

25

Case 3:18-ap-03008-SHB   Doc 26-17   Filed 10/15/19   Entered 10/15/19 21:44:03
Desc Exhibit 16 Transcript of Proceedings before Special Master   Page 131 of 131

131

C E R T I F I C A T E

STATE OF TENNESSEE:

COUNTY OF SEVIER:


        I, MALINDA R. KINNAIRD, Court Reporter and Notary

Public, do hereby certify that I reported in machine

shorthand the above proceedings, and that the foregoing

pages were typed under my personal supervision and

constitute a true and accurate record of the proceedings.

        I further certify that I am not an attorney or

counsel for any of the parties; nor a relative or employee

of any attorney or counsel connected with the action nor

financially interested in the action.

        This the 16th day of August, 2016.


_Malinda Kinnaird_

MALINDA R. KINNAIRD

Court Reporter, LCR #435

and Notary Public at Large


My commission expires:   October 8, 2019